David J. Noonan (55966)
        dnoonan@knlh.com
Lauren E. Butz (246668)
        lbutz@knlh.com
KIRBY NOONAN LANCE & HOGE LLP
350 Tenth Avenue, Suite 1300
San Diego, CA  92101-8700
Telephone:  (619) 231-8666
Facsimile:  (619) 231-9593

Mitchell A. Kramer (*Pro Hac Vice*)
        mkramer@kramerandkramer.com
KRAMER & KRAMER, LLP
1077 Rydal Road, Suite 100
Rydal, PA  19046
Telephone:  (215) 887-9030
Facsimile (215) 887-9240

Barbara H. Kramer (*Pro Hac Vice*)
        bkramer@kramerandkramer.com
KRAMER & KRAMER, LLP
24 Frank Lloyd Wright, Lobby D
Ann Arbor, Michigan  48105
Telephone: (734) 930-5452
Facsimile: (734) 665-8788

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDICAL SALES & CONSULTING GROUP, et al. | CASE NO. 08cv1595-BEN |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE EXPERT REPORT AND TESTIMONY OF R. BRUCE PHILLIPS** |
| v. | |
| PLUS ORTHOPAEDICS USA, INC., et al. Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................. ii

INTRODUCTION ........................................................................................... 2

I.      Mr. Phillips Is Qualified to Offer Expert Opinions ................................. 3

II.     Mr. Phillips's Report and Proposed Testimony Provide Industry-Specific
        Analysis That Will Assist the Trier of Fact ............................................ 5

III.    Standards of Reliability for Non-Scientific Evidence ............................. 6

        A.   Mr. Phillips's Opinions Regarding Smith & Nephew's Impairment
             of Plaintiffs' Ability to Sell and Unattainability of Quotas in Light of
             Its Conduct Are Reliable ................................................................. 8

        B.   Mr. Phillips's Alleged Failure to Evaluate Other Relevant Factors
             Goes to the Weight of The Evidence, Not Admissibility ..................... 10

        C.   Mr. Phillips's Opinions Regarding Industry Practice in Integration of
             Sales Forces After Acquisition Are Reliable Under Rule 702 ............. 11

IV.     Mr. Phillips's Opinions Regarding the Change in Control Provision
        Are Appropriately Limited to Industry-Specific Factual Issues and
        Do Not Invade the Province of the Court ............................................... 12

V.      Defendants Are Not Prejudiced By Plaintiffs' Use of Two Experts .......... 14

CONCLUSION ............................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 1167
   (1993) ................................................................................................6, 7, 10

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998
(9th Cir. 2004) ..................................................................3, 7, 8, 10, 11, 12

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002)............................10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) ..........6, 9

*Shore v. County of Mohave,* 644 F.2d 1320 (9th Cir.1981)............................6, 12

*Thomas v. Newton International Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994) .......3, 4

*Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176 (2d Cir.),
   cert. denied, 506 U.S. 826, 113 S.Ct. 82 (1992) ............................................10

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ....................................7

*White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002)......................................7

**RULES**

Fed.R.Evid. 702 ........................................................................... passim

Fed.R.Evid. 704(a) .................................................................................14

**INTRODUCTION**

Federal Rule of Evidence 702 states that if an expert is qualified to render his opinions and those opinions will assist the trier of fact, the expert may testify as to his opinions so long as the testimony has a sufficient factual foundation and is reliable.  The opinions and proposed testimony of R. Bruce Phillips readily meet the Rule 702 requirements.

As reflected in the attached resume, Mr. Phillips has dedicated the past twenty years of his career to the orthopedic medical device industry and continues to work in the industry today.  *See* R. Bruce Phillips Résumé, attached as Exhibit 1.  He has experience in all aspects of the industry from the manufacturing side including sales administration; human resources; regulatory affairs; quality assurance; clinical affairs; and sales agency agreement drafting and negotiation.  Mr. Phillips also has personal experience leading the legal team that managed the integration of the U.S. sales force of a large orthopedic medical device manufacturer (Zimmer, Inc.) after its acquisition of another smaller manufacturer of such devices (Centerpulse, Inc.).  Accordingly, Mr. Phillips is highly qualified to testify regarding industry standards and practice relating to the treatment of independent sales representatives and the integration of two overlapping sales forces after an acquisition.

Mr. Phillips's testimony, which is described in the report, will be of assistance to the trier of fact, which, in the case of a bench trial like this one, is the Court.  *See* June 16, 2010 Report of R. Bruce Phillips, attached as Exhibit 2.  July 16, 2010 Supplemental Report of R. Bruce Phillips, attached as Exhibit 3.

This is a factually complicated case involving a specialized industry and voluminous documents.  Mr. Phillips's opinions will provide an industry-specific context and history that will simplify the factual issues facing the Court and likely shorten the trial.

Defendants make a number of arguments regarding the "reliability" of Mr. Phillips's

opinions.  These arguments do not bear on the admissibility of the opinions, but speak only to the weight of the evidence.  Mr. Phillips's opinions also do not consist of legal conclusions, but provide industry-specific context that will be helpful in understanding and applying certain contractual phrases in sales agency agreements.  Because the trier of fact is the Court, there is little, if any, danger of the Court being unduly swayed by Mr. Phillips's opinions.

Mr. Phillips is qualified; his opinions will assist the trier of fact; he does not testify as to any ultimate legal issues; and his opinions have a sufficient factual basis and are reliable.  Accordingly, Plaintiffs respectfully request that the Court deny Defendants' Motion to Strike the Expert Report and Testimony of R. Bruce Phillips.

## I.   Mr. Phillips Is Qualified to Offer Expert Opinions.

Federal Rule of Evidence 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "Rule 702 'contemplates a *broad conception* of expert qualifications.'"  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)) (emphasis in original).  Moreover, "'the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert.'"  *Id.* (quoting *Thomas*, 42 F.3d at 1269); *see also* Fed. R. Evid. 702 advisory committee's note ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

Mr. Phillips is highly qualified to offer expert opinions regarding the industry standards and practices related to orthopedic medical device sales.  As described in his resume, he has decades of experience counseling medical device manufacturers in all aspects of the industry.  *See* Exhibit 1.  Mr. Phillips has extensive experience managing relationships with outside sales organizations, including the negotiation, review, and administration of sales agency agreements,

1   which necessarily includes the setting and review of quotas. *Id.*

2   Defendants seem to suggest that Mr. Phillips was a low-level Zimmer employee who had

3   little to do with the Zimmer-Centerpulse integration. Such a characterization is incorrect. Mr.

4   Phillips led the legal team that guided the integration of the U.S. sales forces following Zimmer's

5   acquisition of Centerpulse and he was recognized for his role in the sales team's timely

6   achievement of integration milestones and budget targets. *Id.* Mr. Phillips also advised the

7   regulatory and human resources teams in Zimmer's spin-out from Bristol-Myers Squibb

8   Company, for which he again received commendation and an award for this leadership role. *Id.*

9   Mr. Phillips's broad experience in the orthopedic medical device sales and manufacturing

10  industries is extensive and highly relevant to the issues in this litigation. He continues to work in

11  the orthopedic medical device industry today by advising manufacturers in a variety of matters

12  involving the medical device industry, including business development in the U.S., product

13  distribution, compliance and compliance training, product evaluation, and distribution

14  agreements. *Id.* Pursuant to Rule 702, Mr. Phillips is qualified to testify as to his opinions.

15  Defendants also suggest that Mr. Phillips is unqualified because he is an attorney and

16  because he has never been an expert before. Rule 702 does not require an expert to have already

17  been an expert to be qualified. As discussed above, Mr. Phillips's experience in the medical

18  device industry is what qualifies him to render expert opinions. His legal background is also

19  irrelevant to the analysis of whether he qualifies as an expert, though it may give him a deeper

20  understanding of the industry-specific meaning of specific contract provisions. Despite the

21  hyperbolic tone of Defendants' Memorandum, Mr. Phillips's legal training is not integral to his

22  report, which does not mention any specific laws or make legal conclusions. *See* Exhibit 2.

23  In *Thomas v. Newton International Enterprises*, the Ninth Circuit reversed the district

24  court's grant of summary judgment to the defendant, which was based in part on the exclusion of

4

the plaintiff's proffered expert – a longshore worker with 29 years of experience in the longshore industry – who submitted a declaration that a hazard on the vessel in issue constituted a dangerous condition.  42 F.3d 1266, 1269 (9th Cir. 1994).  The Ninth Circuit acknowledged Rule 702's "broad conception of expert qualifications" and concluded that, "[c]learly, [the proffered expert's 29 years of experience] lays at least the minimal foundation of knowledge, skill, and experience required in order to give 'expert' testimony as to the working conditions of experienced longshore personnel." *Id.* at 1269-70.

The same is true here.  Mr. Phillips has spent the past 20 years of his career immersed in the orthopedic medical device industry.  He has extensive experience working with outside sales agents and negotiating and reviewing manufacturers' agreements with them.  He led an integration team after Zimmer's acquisition of Centerpulse and received awards and commendations for the integration's success.  Mr. Phillips is qualified to offer opinions regarding the standards and practices relevant to the orthopedic medical device industry.

**II.   Mr. Phillips's Report and Proposed Testimony Provide Industry-Specific Analysis That Will Assist the Trier of Fact.**

Federal Rule of Evidence 702 allows the admission of testimony by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."  Mr. Phillips's report and proposed testimony will assist the trier of fact – in this case, the Court – in understanding the unique characteristics of the orthopedic medical device industry, including business practices regarding the agreements between manufacturers and their outside sales agents and the issues that arise relating to these agreements and the treatment of sales agents during the integration of sales forces following an acquisition.  *See* Exhibit 2.

For instance, one common industry practice in the orthopedic medical device industry is the use of independent sales agents, as opposed to employees, to promote and market implants in exclusive territories to physicians who ultimately implant the products into the patients.  *Id.* at 4.

In the case of an acquisition and integration, therefore, the acquiring company may have two independent but overlapping sales forces that need to be managed and integrated into one functioning unit, raising questions of how the industry generally handles the incoming sales agents and their agreements, and what is reasonable in such an integration. *Id.* at 4-5, 8.

Because this is a bench trial, there is little, if any, risk of the Court being improperly swayed by Mr. Phillips's testimony or opinions. *See Shore v. County of Mohave,* 644 F.2d 1320, 1322-23 (9th Cir.1981) ("Since this was a bench trial, there was little danger ... the court would have been unduly impressed by the expert's testimony or opinion" and therefore the district court should have allowed testimony and given it weight it deserved). Mr. Phillips's testimony also will assist the Court by likely shortening the trial. This matter involves five Plaintiff groups and millions of pages of documents, and Mr. Phillips, through his substantial knowledge and experience in the industry, is able to help distill the voluminous information and testify as to how the industry addresses the issues unique to each Plaintiff group. Therefore, Mr. Phillips will assist the Court in sorting through the evidence and determining the facts at issue, which satisfies Rule 702.

## III.    Standards of Reliability for Non-Scientific Evidence.

Rule 702 allows the admission of "scientific, technical, or other specialized knowledge" by a qualified expert to assist the trier of fact. Fed. R. Evid. 702. Rule 702 requires that the proffered expert testimony be: (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) the result of the reliable application of the principles and methodology to the facts of the case. Fed. R. Evid. 702.

*Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 1167 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct.. 1167 (1999) "require that the judge apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony."

*White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002).  The Ninth Circuit further explains

that "far from requiring trial judges to mechanically apply the *Daubert* factors – or something like

them – to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that

judges are entitled to broad discretion when discharging their gatekeeping function." *United*

*States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Additionally, "a trial court not only has

broad latitude in determining whether an expert's testimony is reliable, but also in deciding how

to determine the testimony's reliability." *Hangarter*, 373 F.3d at 1017 (citations omitted).

Defendants misconstrue the law relating to non-scientific expert opinions like those at

issue here.  Defendants claim that, even though Mr. Phillips's opinions are based on his

experience and knowledge in the orthopedic medical device industry and not science, his

reasoning and methodology "must be 'ground[ed] in the methods and procedures of science . . . ."

Defendants' Memorandum at 4-5.  This does not accurately state the law.

Concerning the reliability of non-scientific testimony such as industry-standards

testimony, the Ninth Circuit has stated that the "*Daubert* factors (peer review, publication,

potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability

depends heavily on the knowledge and experience of the expert, rather than the methodology or

theory behind it." *Hangarter*, 373 F.3d at 1017 (concerning testimony as to whether defendants'

practices were consistent with industry standards) (citing *Hankey*, 203 F.3d at 1169 and *Kumho*

*Tire*, 526 U.S. at 150, 119 S. Ct. 1167 ("Engineering testimony rests upon scientific foundations,

the reliability of which will be at issue in some cases . . . .  In other cases, the relevant reliability

concerns may focus upon personal knowledge or experience.")).

In *Hangarter*, the Ninth Circuit affirmed the admission of expert opinions regarding

whether the disability insurer's practices deviated from insurance industry standards, an analysis

that was primarily dependent upon the witness's knowledge of and experience in the insurance

industry.  *Id.* at 1017-18.  The Court concluded: "Given that, unlike scientific or technical

testimony, the reliability of [the witness's] testimony was not contingent upon a particular

methodology or technical framework," the district court properly found the testimony reliable

based on the witness's knowledge and experience.  *Id.* at 1018.

Here, Mr. Phillips has dedicated his career to the issues facing orthopedic medical device

manufacturers, including the integration of sales agents and manufacturers' business practices

concerning their agreements with sales agents.  Mr. Phillips's extensive knowledge of and long

experience in the industry are the foundation for the opinions in his report.  Therefore, his

opinions need not be rooted in scientific theory, and, pursuant to Rule 702, his opinions are

admissible.

A.    Mr. Phillips's Opinions Regarding Smith & Nephew's Impairment of Plaintiffs'
      Ability to Sell and Unattainability of Quotas in Light of Its Conduct Are Reliable.

Defendants argue that Mr. Phillips's opinions that Smith & Nephew's conduct impaired

Plaintiffs' ability to sell products and therefore rendered their quotas unattainable are unreliable.

But these so-called "reliability" arguments are relevant only to the weight of Mr. Phillips's report

and proposed testimony, not the admissibility of such evidence.  *See Hangarter*, 373 F.3d at 1017

n. 14 (citation omitted) (factual basis of expert's opinions go to credibility, not admissibility and

opposing party may explore factual basis for opinion during cross-examination).

Mr. Phillips's report addresses the conduct of Smith & Nephew after its acquisition of

Plus and examines whether such conduct impaired Plaintiffs' ability to sell products.  *See* Exhibit

2 at 13-16; Exhibit 3 at 1-2.  His report states, in part, as follows:

> In the context of my experience within the industry and sales force integration, I
> looked at events that the Plaintiffs did not control but that adversely affected their
> ability to generate sales and maintain customer relationships. . . . .
> •       I found the following examples to support Plaintiffs' contentions.  I note
> that some points necessarily rely on Plaintiffs' characterizations of the facts.  As
> fact discovery is ongoing, it is not yet known which of these characterizations may
> be disputed.  This report will be supplemented as required.

8

●       The Portland acetabular cup product was removed from the Plus portfolio and the comparable Smith & Nephew cup was not made available to Plaintiffs. . .

●       Plus had new products in development before the acquisition . . . . Plus had communicated to its agents that these project were viable, but following the acquisition, no new Plus products were made available to them. . . .

●       Plaintiffs were not provided with compliance training mandated by agreements with federal authorities...

* * * *

●       Recall information was not effectively communicated to customers, resulting in delayed retrieval of recalled product.

●       By late 2007, Plaintiffs indicate that legacy Plus products began to appear in Smith & Nephew boxes and the Plus name became less prominent. . . .

●       After the acquisition, Plus customer service transitioned to Smith & Nephew and product stock numbers changed, but Plaintiffs did not have access to Smith & Nephew's iPAQ hand-held order-entry tool. . . .

●       Product number changes also made it more difficult to locate and retrieve recalled products.

●       The need to recall certain products contributed to product availability issues.

●       More directly, hospital payment systems often do not allow the identical product to be invoiced by more than one vendor (manufacturer). . . . . [T]his reportedly caused customers difficulty when the Plus product numbers from the box did not match the Smith & Nephew product numbers on the invoice, which in turn led to processing delays, delays in payment, and delays in commission receipts.

●       Back orders increased, making products unavailable for surgery and reducing Plaintiffs' sales.

●       In some cases, as with ORS, local Smith & Nephew sales representatives reportedly continued to act as competitors, converting Plus-using surgeons to Smith & Nephew products.

*See* Exhibit 2 at 13-16. Mr. Phillips's Report then continues to discuss how each of these acts by Smith & Nephew impaired each particular Plaintiff group's ability to sell Plus products. *Id.* at 16-18. Mr. Phillips's Report further explains that, in light of this conduct by Smith & Nephew, which impaired Plaintiffs' ability to sell, Plaintiffs' quotas were not adjusted and therefore were unreasonably high. *Id.*

Defendants complain that this analysis is unreliable because it fails to meet the *Daubert* factors. Defendants' Memorandum at 5. As discussed above, however, in the case of non-scientific evidence that is primarily based on an expert's knowledge and experience, the *Daubert*

factors are largely irrelevant. *See Hangarter*, 373 F.3d at 1017 (*Daubert* factors not applicable to non-scientific evidence that relies on knowledge and experience of expert). Mr. Phillips's report and proposed testimony as to the effect of Smith & Nephew's conduct on Plaintiffs' sales are reliable because of his vast knowledge of the orthopedic medical device industry.

Defendants also assert that Mr. Phillips's methodology was somehow flawed because he reviewed discovery documents and depositions, talked to Plaintiffs, and relied on his industry experience in reaching his conclusions. All of this evidence is of the type that is routinely relied upon by experts and provides a sufficient factual basis for his opinions. Defendants' assertions, therefore, are not relevant to the issue of reliability; they address the weight of Mr. Phillips's testimony, not its admissibility. *See Hangarter*, 373 F.3d at 1017 n. 14; *see also Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1188 (2d Cir.), cert. denied, 506 U.S. 826, 113 S.Ct. 82 (1992) (contentions of unfounded assumptions go to weight, not admissibility of expert testimony).

Here, Defendants' counsel can challenge, through cross-examination, Mr. Phillips's opinions regarding the effect of Smith & Nephew's conduct on Plaintiffs' ability to sell products and the resulting unattainability of their quotas, and the Court can assign the weight that it feels is appropriate to those opinions. Accordingly, Mr. Phillips's opinions on these topics are reliable and satisfy the requirements of Rule 702.

B.   Mr. Phillips's Alleged Failure to Evaluate Other Relevant Factors Goes to the Weight of The Evidence, Not Admissibility.

Defendants also allege that Mr. Phillips's opinions are unreliable because his methodology ignores alternative factors and their impact on Plaintiffs' ability to make sales. Again, this argument goes to the weight of Mr. Phillips's testimony, not the admissibility. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (Court rejected argument that expert's testimony and study should be excluded because analysis did not eliminate all possible

1    legitimate nondiscriminatory factors; failure to include all variables affects weight of expert's

2    testimony, not its admissibility).  Defendants can cross-examine Mr. Phillips regarding the other

3    factors that they believe should have been included in his report.  Therefore, Mr. Phillips

4    testimony is admissible pursuant to Rule 702.

5
         C.    Mr. Phillips's Opinions Regarding Industry Practice in Integration of Sales Forces

6              After Acquisition Are Reliable Under Rule 702.

7         The report of Mr. Phillips includes a section regarding industry standards and business

8    practices relating to the integration of two competing sales forces after an acquisition.  *See*

9    Exhibit 2 at 2-3; Exhibit 3 at 2-4.

10
         Defendants argue that Mr. Phillips's opinions regarding these industry standards and

11   business practices are unreliable because he bases his opinions, in part, on publicly available

12   information relating to the Zimmer-Centerpulse integration.  Defendants' Memorandum at 7-8.

13   Of course, as Defendants also acknowledge, Mr. Phillips's opinions are based not only on the

14   public documents related to the Zimmer-Centerpulse integration, but his experience in the

15   orthopedic medical device industry, including his personal experience leading the legal team

16   guiding the integration of Zimmer's U.S. sales forces after the acquisition of Centerpulse.  Mr.

17
     Phillips's report also states that he considered a McKinsey Quarterly article entitled *Mastering*
18
     *Sales Force Integration in a Merger*. *See* Exhibit 2, Phillips Report at 6, 20.  Accordingly, Mr.
19
     Phillips possesses a substantial factual foundation for his opinions.
20

21        As discussed above, the factual bases of an expert's opinions go to the weight of the

22   testimony, not the admissibility.  *Hangarter*, 373 F.3d at 1017 n. 14 (citing *Children's*

23   *Broadcasting Corp.*, 357 F.3d at 865).  Again, Defendants are free to challenge the factual bases

24   for Mr. Phillips's opinions on cross-examination.  *Id.* However, Mr. Phillips's opinions regarding

25   the business practices as to the integration of sales forces after an acquisition in this specific

26   industry are sufficiently reliable and admissible.

27

28

                                        11                    CASE NO.  08CV1595-BEN (BLM)

IV.   **Mr. Phillips's Opinions Regarding the Change in Control Provision Are Appropriately Limited to Industry-Specific Factual Issues and Do Not Invade the Province of the Court.**

Federal Rule of Evidence 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Accordingly, the Ninth Circuit has recognized the "well-established" principle that expert testimony concerning an ultimate issue is not per se improper. *Hangarter*, 373 F.3d at 1017 (citations and quotations omitted).   Of course, an expert does not give legal conclusions, which is an ultimate issue of law for the Court. *Id.* But, Mr. Phillips does not do so, and because this is a bench trial, no danger exists of the Court being inappropriately influenced by Mr. Phillips's law degree and opinions. *See Shore*, 644 F.2d at 1322-23 (district court should have admitted expert testimony and afforded it appropriate weight; little danger of undue weight being accorded expert testimony in bench trial).

In *Hangarter*, the defendants argued that the plaintiffs' expert's testimony that the defendants "failed to comport with industry standards inappropriately reached legal conclusions on the issue of bad faith and improperly instructed the jury on the applicable law." *Hangarter*, 373 F.3d at 1016. The Ninth Circuit disagreed. "While [the expert's] testimony that Defendants deviated from industry standards supported a finding that they acted in bad faith, [the expert] never testified that he had reached a legal conclusion that Defendants actually acted in bad faith (i.e., an ultimate issue of law)." *Id.*

The same reasoning applies here. Mr. Phillips opinions regarding the phrase comparable designation relate to industry standards and business practices as to sales agency agreements. Mr. Phillips's opinions do not include any inappropriate conclusions of law. His opinions regarding whether Plaintiff Bonamarte received a "comparable designation" under the change-in-control provision in his contract analyzes the possible meanings of the phrase in the context of the

orthopedic medical device industry and its history.  This analysis is entirely appropriate because, as Defendants acknowledge, "'[w]here a contract's meaning is not clear on its face, its interpretation depends upon the parties' intent at the time it was executed, *which is an issue for the trier of fact.*'"  Defendants' Memorandum at 3 (quotation omitted and emphasis added).

In reaching his opinions regarding "comparable designation" Mr. Phillips "looked to the industry's history and to the factual record for insight into the parties' intent and their balance of power in negotiating this provision." Exhibit 2, Phillips Report at 7.  Moreover, Mr. Phillips does not limit himself to the meaning of "comparable designation" that he believes best reflects the original intent of the parties, but includes all possible meanings of the phrase, even the meaning that counsel for Smith & Nephew has previously endorsed.  Exhibit 2 at 9-12.

Mr. Phillips analysis of the phrase comparably designated is not an application of the law to the facts, but an industry-specific analysis of the facts of the case.

Defendants also appear to argue that because the comparable designation provision is unusual, Mr. Phillips is prohibited from offering his opinions as to its meaning within the industry.  This argument is without merit.  Mr. Phillips's knowledge and experience in the orthopedic medical device industry will assist the Court by providing the history and context necessary to ascertain the meaning of the phrase in light of the parties' intent and the standard business practices of the industry.

Mr. Phillips never cites to any laws in reaching his opinions, nor does he come to any ultimate legal conclusions.  He merely provides a contextual and historical framework of industry standards and business practices from the perspective of an industry manufacturer to assist the Court in reaching its ultimate conclusions.

## V.    Defendants Are Not Prejudiced By Plaintiffs' Use of Two Experts.

Defendants argue that Plaintiffs are precluded from using two experts at trial because one

joint motion and one order refer to the singular "expert" instead of "experts." Defendants'

Memorandum at 9. As acknowledged by Defendants, however, Plaintiffs' answer to an

Interrogatory from Defendants regarding the identification of experts states that "Plaintiffs will

identify experts at the time and in the manner required by the Court," which clearly includes

"experts" plural, not singular. Defendants' Exhibit B, Interrogatory Response No. 20. Moreover,

Defendants were specifically advised that Plaintiffs intended to retain an expert relating to the

medical device industry. Plaintiffs' initial disclosures stated that each plaintiff would have

"expert witnesses" concerning both damages and "the nature and operations of a manufacturer of

medical devices." Exhibit 4, Plaintiffs' Initial Disclosures at 2, 4, 5, 6, and 7.

The chain of scheduling orders, each extending the dates of the prior, all refer to the

parties identifying and producing the reports of any experts. *See, e.g.,* Doc. No. 14 at par. 2 and

3; Doc. No. 25 at par 1 and 2; Doc. No. 52 at par. 1 and 2. The most recent order, though it uses

the singular, is a request to extend a deadline in Doc. No. 52, requiring that the parties exchange

"a list of all expert witnesses expected to be called at trial" and a written report as to "each expert

witness."

In fact, Defendants have already proffered expert testimony responding to Mr. Phillips's

expert opinions in their own expert report.[1]  *See* Exhibit 5, Wallace Report at 37-39. Defendants

had opportunity to respond to Mr. Phillips, and are not at all prejudiced by Mr. Phillips's

opinions, and Plaintiffs' respectfully request that the Court permit their use of two experts at trial.

/////

/////

/////

/////

---

[1] Plaintiffs' do not concede that Mr. Wallace is qualified to testify as an  expert on all matters on which his
offers opinions.

14

1

2

## **CONCLUSION**

3

4

For all of the aforementioned reasons, Plaintiffs respectfully request that the Court

deny Defendants' Motion to Strike Expert Report and Testimony of R. Bruce Phillips.

5

6

7

Dated:  July 26, 2010

8

KRAMER & KRAMER, LLP

9

10

BY:  */s/ Mitchell A. Kramer*
Mitchell A. Kramer

11

1077 Rydal Road, Suite 100
Rydal, PA  19046

12

(215) 887-9030
(215) 887-9240 fax

13

mkramer@kramerandkramer.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

CASE NO.  08CV1595-BEN (BLM)

Index of Exhibits
In Accordance with Local Rule 5.1(e)

Exhibit 1................................................  00002 to      00003

Exhibit 2................................................  00005 to      00032

Exhibit 3................................................  00034 to      00037

Exhibit 4................................................  00039 to      00053

Exhibit 5................................................  00055 to      00058

# EXHIBIT 1

# R. Bruce Phillips

7733 Comstock Lane North       Home Phone 763/657-0849
Maple Grove, Minnesota 55311   Mobile Phone 574/453-7403

**Background summary**

Twenty years in practice counseling medical device manufacturers and sales organizations on a variety of matters, including compliance with federal laws and development of product distribution relationships.

**Professional experience**

2007 – Present      Bruce Phillips Law Office      Maple Grove, Minnesota
**Owner/Principal**

- Advise European medical device manufacturer on development of US business, product distribution, and compliance matters. Prepare product evaluation and distribution agreements.
- Counsel to orthopaedic device sales organizations. Provide guidance on compliance with US federal laws governing health care, including the anti-kickback statute and regulations. Facilitate the evolution and improvement of compliance programs. Draft and revise policies, procedures, and supporting forms.

2005 – 2007      Bruce Phillips Consulting Services      Warsaw, Indiana
**Owner/Principal**

- Provided compliance consulting, employee training, and related services to Zimmer sales organizations with frequent speaking engagements at local distributor offices throughout the United States.
- Coordinated the development and implementation of formal compliance programs focusing on anti-kickback statute and related federal laws; trained compliance officers and committees, sales people, and staff.

2001 – 2004      Zimmer, Inc.      Warsaw, Indiana
**Associate Counsel**

- Provided legal counsel to Zimmer, Inc. Advised business managers on issues arising in connection with the development, manufacturing, promotion, and sale of medical devices. Developed and presented annual training sessions for groups of more than 200 sales associates at national conventions.
- Primary legal resource for Sales Administration, Human Resources, Regulatory Affairs, Quality Assurance, and Clinical Affairs groups.
- Led legal team guiding integration of US sales forces following Centerpulse acquisition. Awarded integration bonus for role in Sales Admin team's timely achievement of milestones and budget targets.
- Advised Regulatory and HR teams in spin-out from Bristol-Myers Squibb Company. Received commendation and award for leadership role in guiding transition teams.

1991 – 2001      Bristol-Myers Squibb Co.      Warsaw, Indiana
**Sr. Attorney / Asst. Counsel(1996) / Associate Counsel (1999)**

- Conducted regulatory compliance training for employees and sales force,

00002

with emphasis on product claims and customer relationship issues.

- Managed litigation, mediation, and settlement of commercial and product-related disputes; directed efforts of outside counsel to resolve claims.

- Counseled product launch teams on domestic and international regulatory considerations and promotional strategies. Counseled Human Resources group on employment issues. Drafted, negotiated, and reviewed agreements with US sales force, suppliers, customers, and consultants.

- Received commendation from President, Orthopaedic Implant Division, for role in development of new sales training program for key product line.

1987 - 1991          Patton, Boggs & Blow          Washington, DC
**Associate Attorney**

- Practiced primarily in regulatory and legislative fields, with emphasis on food and drug law. Counseled industry clients on promotion, safety and enforcement issues concerning foods, pharmaceutical products, and medical devices, including food ingredient labeling.

- Developed clients' positions and assisted in advocating them before administrative agencies and to congressional committee staff.

- Drafted pleadings in litigated disputes, and negotiated with compliance staff at FDA, OSHA, and the Consumer Product Safety Commission to resolve regulatory issues.

**Other work experience**          1980 - 1984          Mount Sinai Hospital          Minneapolis, MN
**Assistant Service Supervisor**

- Coordinated the activities of 8 to 12 ward clerks; presented in-service programs; developed and implemented Nursing Department policies.

**Education**          1984 - 1987          Georgetown U. Law Center          Washington, DC
**Juris Doctor**

- Notes and Comments Editor, *The Tax Lawyer*
- Dean's List
- Lawyers' Cooperative Publishing Company Prize: Negotiations

1975 - 1979          Carleton College          Northfield, MN
**Bachelor of Arts**

- *Cum laude*
- Distinction in Major – English literature and composition

**Professional memberships**          Minnesota State Bar Association; MSBA Health Law Section

District of Columbia Bar Association (inactive); Health Law Section

# EXHIBIT 2

**Report of R. Bruce Phillips**

**Medical Sales and Consulting Group, et al.**
v.
**Plus Orthopaedics USA, Inc., et al.**

**United States District Court**
**Southern District of California**
**Case No. 08-CV-1595 BEN**

*Purpose*

I have been engaged by the Plaintiffs in the above referenced matter to provide industry-specific analysis of three issues pertaining to the Defendants' liability, as set out below.

It is my understanding that I may be called to testify at trial as to my conclusions on these issues. The purpose of this report is to provide a summary of my conclusions, which are based on the information I have reviewed to date. The procurement of additional discovery may require that I amend my findings. If additional information is obtained in the future, I will submit an amended report.

*Issues*

1. Did Bonamarte receive a "comparable designation" following Smith-Nephew's acquisition of Plus?

2. Did Smith-Nephew's actions impair the Plus agents' ability to sell products? If so, were quotas for ORS and Adams set unreasonably high? Were quotas for C. Nichols and M. Nichols set unreasonably high?

3. How should an orthopedic device manufacturer handle the sales agents of a company it acquires? What is the industry practice?

1

*Conclusions*

Based on my analysis of the facts and data in this specific matter and my experience with sales representation relationships and sales force integration in the orthopedic medical device industry, my conclusions are as follows:

1.  Bonamarte did not receive a "comparable designation" following Smith & Nephew's acquisition of Plus.

2.  Smith & Nephew's actions and inaction did impair the Plus agents' ability to sell product. In view of the impairment, sales quotas for ORS and Adams were set unreasonably high. To the extent quotas for C. Nichols and M. Nichols were set by Smith & Nephew to reflect the company's overall growth expectations and not adjusted for impairment of the Plus business, their quotas are also likely to be unreasonably high.

3.  Agents of the acquired company should be evaluated quickly and their future determined expeditiously and fairly, in accordance with an overall integration plan and the terms of their existing contracts. The integration plan should be assigned adequate staff and resources, and adequately funded from the acquisition budget, so that it can be executed effectively. It should be under nearly constant management review in its early stages, so that it can be adapted to changing circumstances.

Industry practice is for the acquiring company to evaluate a "new" agent against its existing sales organization in the comparable territory, and retain the better of the two. Rarely, a territory may be divided to make room for both. Some personnel and assets of the lesser agent may be folded into the surviving organization. Where the new agent does not become an agent of the acquiring company, industry practice is to negotiate a buy-out of the agent's business – to compensate the agent for the portion of its business that will be lost to the acquiring company.

2

The amount and timing of the buy-out is based on a formula that may take into account such factors as past sales, projected sales growth, and the requirements of the agent's contract with the acquired company.

## Experience

I am currently principal of Bruce Phillips Law Office, a solo practice primarily advising small medical device manufacturers and sales organizations on compliance matters and business relationships. From 1991 to 2004, I served on the in-house legal staff of Zimmer, Inc., an industry-leading orthopedic device manufacturer. During that time, my principal clients included the Sales Administration group, which had responsibility for managing Zimmer's relationships with its independent sales agents. My duties included drafting, negotiating, implementing, and resolving disputes over sales representation agreements, some of which contained change-in-control provisions. When Zimmer acquired Centerpulse in 2003, I had primary responsibility for advising the company on legal issues arising in connection with sales force integration. From 2005 through 2007, I worked as a consultant for the Zimmer sales organizations, coordinating implementation of compliance programs and training sales staff. For further information on my professional experience and education, I have attached a copy of my résumé. I have authored no publications in the last ten years, nor have I testified as an expert at trial or by deposition during the previous four years.

## Compensation

My fee in this matter is based on time charges for my services, billed at $150 per hour, regardless of the outcome. I have no prior acquaintance or relationship with any of the plaintiffs other than Mr. Adams, who was a principal owner of a Centerpulse sales agency and later a Zimmer sales agency, following Zimmer's acquisition of Centerpulse. My prior acquaintance with Mr. Adams has

3

not influenced my findings in this matter in any way.

### General Background

Plaintiffs are individuals and companies experienced in the business of selling medical devices. Device manufacturers engage them as sales agents to solicit orders for products in a defined territory, and pay them commissions on the sales. The agents' businesses are independent of the device manufacturers they represent, and the relationship between them is governed by a written agreement specifying the sales territory and commission schedules, among other terms.

Defendants manufacture medical devices for the treatment of orthopedic disorders, and Plaintiffs mainly sell such orthopedic devices. Defendant PLUS Orthopaedics USA, Inc., (Plus) entered into contracts with each of the Plaintiffs between approximately 2000 and 2006. Plaintiffs indicate that Plus was a small company working to earn a share of the US orthopedic market, and that Plus sought them out – in part because of the strong working relationships they had established with surgeons in their territories. Each Plaintiff had an exclusive right to sell Plus products in its territory. All of the Plaintiffs were Plus agents at the time Defendant Smith & Nephew agreed to acquire Plus in March 2007.

Smith & Nephew had an established network of US sales organizations when it acquired Plus. As part of its overall plan to join the two companies, Smith & Nephew planned to integrate the US sales forces. It communicated that the expectation was for everyone to sell everything, meaning that Plus representatives would be trained and allowed to sell Smith & Nephew products in addition to Plus, and Smith & Nephew reps would be trained and allowed to sell Plus in addition to the products they already sold. As between Smith & Nephew and the five Plaintiffs, contract issues were raised and proposals sometimes discussed, but not concluded. In the mean time, the Plaintiffs continued to sell only the products Plus agents had been selling before the acquisition (the "legacy Plus products") and

4

not the full range of Smith & Nephew products. Ultimately Smith & Nephew and the Plaintiffs did not come to terms, and the Plaintiffs' Plus contracts were either terminated or allowed to expire.

## Documents Reviewed

In developing the inferences and conclusions stated in this report, the following documents were reviewed:

1. Sales Representative Agreement between PLUS Orthopaedics and Precision Orthopaedics, Inc. (Bonamarte) dated 1 August 2003, as amended

2. Sales Agent Agreement between PLUS Orthopaedics and OR Services, Inc. (ORS) dated 1 August 2005, as amended

3. Memorandum from Heidi Ahmed to Craig Grabell dated 9 July 2007 listing termination clauses from contracts of Plus agents

4. Portions of the deposition transcript of Sean Cogan together with the Exhibits

5. Portions of the deposition transcript of David Ware

6. Portions of the deposition transcript of Emmett Bonamarte

7. Portions of the deposition transcript of Mark Distin

8. Select correspondence between counsel regarding the change-in-control provision in the Precision Orthopaedics Midwest, Inc. Sales Representative Agreement

9. Memorandum dated 10 August 2007 from Emmett Bonamarte to Craig Grabell

10. Memorandum dated 24 September 2007 from Pat Makris to Emmett Bonamarte

11. Plaintiffs' Amended Complaint and Defendants' Answers to Interrogatories

12. PM Business News article, December 2007 edition, regarding Smith & Nephew

13. Smith & Nephew press release regarding Plus acquisition, dated 12 March 2007

14. Portions of Zimmer Holdings SEC Rule 425 Filings dated 21 May 2003, 13 January

00009

2004, 27 January 2004: Business-Combination Transaction Communications

15. Portions of a paper entitled *"Mergers and Acquisitions in the Medical Device Industry: An Exploration of Factors Influencing Valuation"* by Jason S. Robins, CFA, submitted to the Harvard-MIT Division of Health Sciences and Technology, 20 August 2008

16. *Mastering Sales Force Integration In a Merger*, McKinsey Quarterly, October 2009

In addition, I relied on my experience in the orthopedic medical device industry with sales representation relationships, sales force integration, sales organizations, and product distribution arrangements.

### Discussion of Issue 1

Bonamarte's contract with Plus included a change-in-control (CIC) provision, which is reproduced in its entirety in Exhibit A, and will be paraphrased here. It is a double-trigger provision requiring payment of a sum of money if both triggering conditions are met. The first trigger is the change in control. The second trigger is framed as a series of steps. In step one, the Successor Company must provide the Representative (Bonamarte) with a "comparable designation to that provided to Representative in this agreement." The term "comparable designation" is not defined, and its meaning is at issue. The next step requires Representative to notify the Successor Company if "Representative *believes* it has not been comparably designated . . . ." [Emphasis added.] Successor must then re-designate the Representative; if Representative still believes the re-designation not to be comparable, it again notifies Successor, which then has an option to arbitrate. Finally, Successor may either re-designate Representative according to the arbitrator's ruling or pay 1.5 times Representative's preceding 12 months' sales.

<u>Method of Analysis</u>:  I researched the phrase "comparable designation" and found no

6

00010

specialized meaning in the context of orthopedic medical device sales agency agreements. Although change-in-control provisions are not uncommon in such agreements, my experience indicates that this form is very unusual. I then looked to the industry's history and to the factual record for insight into the parties' intent and their balance of power in negotiating this provision. What concerns led Bonamarte to insist on the change-in-control provision? Why would Plus accept it? I identified three ways to interpret the change-in-control provision in its historical context. To evaluate whether the "comparable designation" was provided, I reviewed information about Bonamarte's status before and after the acquisition.

- Industry History

  - In the orthopaedic implant sales business, there is a reasonable chance that a small but growing company will become an acquisition target for a larger player.

  - In an acquisition, the target's sales agencies face a real risk of termination. In any given sales territory, the larger player generally already has in place a sales organization covering the same territory that the target company's agent covers. They are competitors before the acquisition. After the acquisition, one of the two organizational structures is redundant. Its sales representatives and customer relationships are usually folded into the other.

  - A change-in-control provision can be useful from a small manufacturer's perspective because it has no upfront cost, but gives the agent an incentive to keep growing sales even when an acquisition is imminent – greater sales translate to a bigger payout if the agency isn't retained. Also, if the payout conditions arise, the cost will be the responsibility of the acquiring company. This cost deferral is not limitless, however, as it can adversely affect the acquired company's valuation – especially if a number of agents have CIC provisions in their contracts – so the CIC provisions tend to be reserved for use with agents perceived to

7

be the best the company can obtain.  From the acquiring company's perspective, CIC provisions are usually on the checklist for due diligence review, so that the potential costs may be factored into the acquisition budget, among other calculations.

- Bonamarte's Experience

  - Bonamarte had been an agent for Centerpulse when it was acquired by Zimmer; he and Zimmer did not come to terms on a position within the combined sales organization, and after accepting a buy-out, Bonamarte had to rebuild his business.  Bonamarte thus had a well founded concern, based on personal experience, that if Plus were acquired, he would not be offered the chance to become a full-line agent of the acquiring company.

  - Bonamarte's discussions with Plus indicated that Plus desired rapid sales growth to establish itself in the US market.  When Bonamarte became available in the spring of 2003, Plus and others contacted him; he believed Plus saw an unusual opportunity to engage an established agent who had strong relationships with influential surgeons – someone who could immediately convince his high volume surgeons to try Plus products, and whose surgeons in turn might influence their peers to try Plus implants.   In Bonamarte's view, Plus believed it would be a coup to sign him as an agent.

  - With several companies making overtures to him, Bonamarte negotiated what he calls a "Michael Jordan" contract with Plus in August 2003.  The contract included higher than normal commission rates and the change-in-control provision.  He recalls that both parties were satisfied with the terms.  He recalls bringing substantial sales to Plus the first month.

- The records I've reviewed point to three plausible ways to construe the phrase "comparable designation" in the context of its creation:

  - <u>Construction A</u>: "Comparable designation" means that Bonamarte would have a relationship with the acquiring company after the change in control that is *proportional* to

8

Bonamarte's relationship with Plus before the change in control.  Bonamarte was the exclusive, full-line agent for Plus and, according to this view, he should become the exclusive, full-line agent for Smith & Nephew in the territory.  Bonamarte would carry the combined company product lines in its sales territory, essentially replacing the existing Smith & Nephew distributorship.  Mr. Bonamarte interprets it this way in his deposition testimony.  Mr. Distin's testimony is consistent with that of Mr. Bonamarte.  That is worth noting here because Mr. Distin was a Plus executive (Vice President of Sales) at the time the agreement was made.  His perspective appears to be from the company's point of view – the party on the other side of the table from Mr. Bonamarte.  Mr. Distin was involved in the negotiation, according to his testimony, and recalls the rationale for the CIC provision in a way that supports Mr. Bonamarte's interpretation.  This evidences a meeting of the minds on the CIC provision and on the meaning of the "comparable designation" language.  Accordingly, this construction appears to best reflect the original intent of the parties.

○ Construction B:  "Comparably Designated" means that Precision would continue as the exclusive Representative for the legacy Plus products, but with no obligation for S&N to add its other products to Precision's bag.  Counsel for S&N appears to have taken this view in correspondence with counsel for Bonamarte, citing an email message to Mr. Bonamarte from S&N RVP Pat Makris.  This interpretation appears not to reflect the intent of the parties, as it is contrary to the Distin and Bonamarte testimony, and contrary to the view Bonamarte expressed in a memo to the Plus President, Craig Grabell, dated 10 August 2007.  It ignores the effect of Bonamarte's belief that he was not comparably designated.  Moreover, this interpretation leads to the situation in which two parallel agencies represent the same company in the same accounts until one agency's contract expires – the very situation which this case shows to be untenable for the business, for customers, and for the

9

people living with it.

○ Construction C: "Comparable Designation" purposely does not have a predetermined definition. In this reading, the CIC provision sets up an "I'll know it when I see it" test, for the benefit of the Representative. It obligates the acquiring company to make an offer to Bonamarte, and if Bonamarte does not believe that the offer constitutes a comparable designation, the acquiring company must try again. If Bonamarte is still not satisfied, an option to arbitrate arises. This interpretation has the change-in-control provision turn on the Representative's *belief* that it has or has not been comparably designated – in other words, whether the Representative is satisfied with the offer after it is made – so no predetermined set of conditions is needed. This is an unusual allocation of power, in my experience, but it renders the change-in-control language internally consistent (not seamless – for example, the provision does not specify what is to happen if the successor company does not elect to arbitrate). More importantly, this reading makes sense in the context of the industry's acquisition history, Bonamarte's experience, the need for Plus to keep Precision motivated to increase sales, and the benefit to Plus of deferring the cost of the CIC provision. It is also consistent with the Distin and Bonamarte testimony, while allowing for some flexibility in the details of the offer. For example, this reading anticipates that the Successor Company might offer an agency with somewhat different territory boundaries or other terms, which may or may not amount to a comparable designation in Bonamarte's view, but he would only know after he had a chance to evaluate it. To a degree, the course of legal correspondence in the record also tracks the process set out in the CIC provision, although the process evidently was truncated.

• Constructions A and B are competing views of how "comparably designated" should be defined; of the two, A best appears to reflect the original intent of the parties, while B leads to

10

an unacceptable result.  Under C, the phrase remains a variable, undefined, until a value is put into the equation in the form of an offer; it then operates as a built-in process for evaluating the offer.  It is best looked at as a method for testing whether the offer reflects the Representative's intention, because it literally depends on what he had in mind.

- Based on the information available to me, it is my opinion that Precision was not provided with a comparable designation under any of these interpretations.

  - According to Construction A, Precision should have been offered the S&N agency.  That did not happen.

  - According to Construction B, limiting Bonamarte to selling only the legacy Plus products might disarm the second change-in-control trigger, but only if Bonamarte's status was substantively the same as before the change in control.  That does not appear to be the case.  On the information available to me, it appears that Bonamarte's business lost sales and value as a direct consequence of the acquisition.  I found the following examples useful:

    - The record indicates that Plus had new products in development before the acquisition, but that no new products were made available to the Plaintiffs.  It is a basic principle of the industry that new products are necessary for business growth.  For agents limited to selling Plus, stopping the flow of new products meant ending that potential for business growth.  It meant not delivering on representations Plus had made regarding, for example, the Polar cup and MIA hip stem – representations that Bonamarte had communicated to his surgeons.  It also meant rendering the now-stagnant Plus lines more vulnerable to competitors offering newer alternatives.

    - By approximately October of 2007, Bonamarte recalls that legacy Plus products began to appear in Smith & Nephew boxes and the Plus name became less prominent.  After the acquisition, Plus customer service transitioned to Smith & Nephew and product

11

00015

stock numbers changed, but Bonamarte did not have access to Smith & Nephew's iPAQ hand-held order-entry tool, delaying orders and delivery. Back orders and mis-shipments increased, making products unavailable for surgery and reducing Bonamarte's sales. "Plus was gone," in his view.

- Smith & Nephew's premature termination of Bonamarte and later attempted rescission led to further loss of customer confidence in Bonamarte and further lost sales: a $400,000 surgeon's business was converted away from Plus, as he recalls.

- Accordingly, keeping only the legacy Plus lines did not constitute the same business opportunities that Bonamarte's business had before the acquisition. Dwindling forward revenue is usually deemed to reduce the value of a business.

- In sum, Bonamarte came to believe that his Plus agency was no longer on a par with its status before the acquisition. Consequently, Bonamarte was not "comparably designated" after the change in control.

○ According to Construction C, Smith & Nephew armed the second trigger by making an offer which Bonamarte rejected. Smith & Nephew had the obligation to try again, but no better offer was made. In the absence of a satisfactory offer, Bonamarte was not "comparably designated."

### Discussion of Issue 2

It is my experience that sales force integration requires sustained and focused attention to a large number of "milestones" that must be identified, arranged along a time line in an integration plan, and met. Unanticipated events may alter milestones, the time line, or the overall plan. If a key underlying assumption in the acquisition thesis is not accurate, it may fundamentally alter the outcomes and result in shareholder expectations not being met. Here, the Plaintiffs contend that their businesses

12

were damaged as a result of Smith & Nephew's acquisition of Plus. In my view, the available facts support Plaintiffs' contention. The record indicates that Smith & Nephew originally welcomed the Plus agents, but that some decisions, such as the one not to distribute iPAQ sales order tools until contracts were in place, seem to have caused difficulty in the integration when contract negotiations stalled. Other issues seem to have arisen from the decision to maintain a few separate Agents selling only the legacy Plus products – for example, the Plus contracts specified a quota-setting process that was not compatible with the automated Smith & Nephew system.

Method of Analysis:  Fact investigation included document review and telephone interviews with each of the individual Plaintiffs, with a view to identifying acquisition-related events that adversely affected Plaintiffs' businesses. In the context of my experience with the industry and sales force integration, I looked at events that the Plaintiffs did not control but that adversely affected their ability to generate sales and maintain customer relationships. To evaluate the effect on quota attainment, I interviewed the Plaintiffs and reviewed the available information against the requirements of their contracts with Plus.

- I found the following examples to support Plaintiffs' contentions. I note that some points necessarily rely on Plaintiffs' characterization of the facts. As fact discovery is ongoing, it is not yet known which of these characterizations may be disputed. This report will be supplemented as required.

  - The Portland acetabular cup product was removed from the Plus portfolio and the comparable Smith & Nephew cup was not made available to Plaintiffs. The Plus agents were left with cups of older design that, in their experience, were less desirable to customers. As the cup and stem components are commonly used together in total hip replacement surgery, they are usually sold together; the loss of the Portland cup would also have been likely to make stem sales more difficult.

13

- Plus had new products in development before the acquisition – notably an acetabular cup called the Polar Cup and a minimally-invasive hip stem known as the Mia hip. Plus had communicated to its agents that these projects were viable, but following the acquisition, no new Plus products were made available to them. It is a basic principle of the industry that new products are necessary for business growth. For agents limited to selling Plus, the absence of new products meant ending that potential for business growth. It meant not delivering on representations Plus had made regarding the Polar cup and Mia hip – representations that Plaintiffs had communicated to their surgeons at the direction of Plus. It also meant that surgeons using the now-stagnant Plus lines would be more inclined to listen to competitors offering newer alternatives.

- Plaintiffs were not provided with compliance training mandated by agreements with federal authorities.

  - Like the other leading orthopedic device companies, Smith & Nephew had entered into a Deferred Prosecution Agreement (DPA) with the US Department of Justice, and a Corporate Integrity Agreement (CIA) with the HHS Office of Inspector General, as part of its settlement of criminal charges arising from alleged violations of the federal anti-kickback statute (AKS).

  - The charges centered on certain consulting agreements between orthopedic companies and surgeons, in which the consultancy payments were alleged to compensate surgeons for using the company's products. The charges also included allegations of other offenses in which sales people were said to woo a surgeon's business away from a competitor (or keep it) by means of gifts and entertainment.

  - The DPA and the CIA contained provisions aimed at forcing long-term culture change in the industry, including mandatory compliance training for all sales people. Although it

14

provided training for its existing sales force, Smith & Nephew did not provide that training to Plaintiffs, even though most if not all of them had business relationships with consulting surgeons in their territories, and even though some of the Plaintiffs had asked to be included.

- Recall information was not effectively communicated to customers, resulting in delayed retrieval of recalled product.

- By late 2007, Plaintiffs indicate that legacy Plus products began to appear in Smith & Nephew boxes and the Plus name became less prominent. They also indicate that the company put out little new marketing material or advertising in support of the legacy Plus products. In general, independent sales agents rely on the manufacturer to produce promotional materials of interest to current and prospective customers. The manufacturer needs to control the content and distribution of such materials for purposes of FDA compliance and the agents' contracts commonly forbid them to create their own. Here, the effect was to further curtail product support.

- After the acquisition, Plus customer service transitioned to Smith & Nephew and product stock numbers changed, but Plaintiffs did not have access to Smith & Nephew's iPAQ hand-held order-entry tool. Plus orders reverted to fax and manual entry, according to Plaintiffs, which delayed orders and delivery. In addition, iPAQ orders received priority for stock replacement, meaning that Plus products went more quickly to the Smith & Nephew organizations who were selling them, further aggravating the back order issues Plaintiffs faced.

- Product number changes also made it more difficult to locate and retrieve recalled products.

- The need to recall certain products contributed to product availability issues.

- More directly, hospital payment systems often do not allow the identical product to be

15

00019

invoiced by more than one vendor (manufacturer). The invoice must match the implant sheet completed at the time of surgery with labels from the implant box. After Plus orders started to process through Smith & Nephew's system, this reportedly caused customers difficulty when the Plus product numbers from the box did not match the Smith & Nephew product numbers on the invoice, which in turn led to processing delays, delays in payment, and delays in commission receipts.

- Back orders increased, making products unavailable for surgery and reducing Plaintiffs' sales.

- In some cases, as with ORS, local Smith & Nephew sales representatives reportedly continued to act as competitors, converting Plus-using surgeons to Smith & Nephew products.

- Accordingly, keeping only the legacy Plus lines without the prospect of new ones, limited support for the existing lines, and difficulties in supply, among other things, had the cumulative effect of eroding the business opportunities that Plaintiffs' businesses enjoyed before the acquisition. Dwindling forward revenue is usually considered a sign of a failing business and generally reduces its value.

- Application to ORS

  - The principal of ORS, Steve Tufts, indicates that he initially felt positive toward the acquisition, stating that in a June 2007 meeting, Andrew Holman told Mr. Tufts he would have an offer on the table in two weeks. The offer did not materialize.

  - The contract between ORS and Plus specified that ORS quotas were to be set "fairly and reasonably" and increases were limited to no more than 18% over the prior year's quota.

  - After the initial three year term, the contract renewed automatically for one year at a time unless terminated for cause (Section 7); failure to meet quota is a listed cause (7.26).

- ○ ORS's annual sales in the year of the acquisition were in the range of $3 Million; due to the limitation on increases, its quota stood in the range of $2 Million.  In those circumstances, the contract would continue to renew automatically.

- ○ After the acquisition, ORS saw its sales decline each year, until January 2009, at which point its contract was terminated for failure to meet quota.

- ○ Mr. Tufts cites the lack of product support and development projects as factors that caused ORS to lose sales.  These were visible to customers, he reports, and says that they saw no future for him with Smith & Nephew, and consequently drifted off.  He also cites the loss of a Phoenix surgeon to the Smith & Nephew sales organization.

- ○ Mr. Tufts indicated that the corporate office instructed him to cease his efforts to work directly with the Smith & Nephew sales organization in Arizona.

- • Application to Kent Adams

- ○ Mr. Adams started with Plus in 2006 to develop a territory in which Plus had little presence, and to delay more promising development in Florida till 2007.  He recalls that Plus told him not to worry about the 2006 quota number in his contract. That is not unusual when an experienced territory builder is asked to work in an area that may take years to bear fruit.

- ○ Smith & Nephew intended to offer him a District Manager position shortly after the acquisition in March 2007; he asked for a scaled non-competition covenant that would extend the longer he stayed; the request was declined and he was offered a standard DM agreement.  The discussions apparently continued intermittently from April through December while he continued as a Plus agent, but were not concluded.

- ○ Adams states that he was not given a quota for 2007, although quota references appeared on his commission statement without notice or discussion.

- ○ He was again instructed not to worry about the quota number because the plan was for him

17

to move into a DM spot.  He was also instructed not to sell Plus actively in his territory as it would confuse customers.

- In mid-2007, Adams was sent a termination letter, for failure to meet quota, although he was allowed to continue selling product.

- Application to C. Nichols and M. Nichols

  - The Nichols' contracts with Plus required annual quotas to be negotiated between the Agent and Plus (1.1), subject to a 30% increase if the parties don't come to agreement.  The process, at any rate, called for the Agent's input.

  - David Ware's testimony indicates that Smith & Nephew's standard mechanism for setting quota did not involve negotiation.  Rather, quotas were set using an algorithm.  The main component simply passed along the overall increase that Memphis had promised to London, (20% in Mr. Ware's example) together with an additional one percent or so added in Memphis, and then the algorithm would adjust for market share in the specific sales territory – lower increase when market share was higher and higher increases when share was low.

  - To the extent quotas were set for them using the Smith & Nephew algorithm, it appears likely that there would have been no negotiation.  It also appears that their quotas would have reflected Smith & Nephew's overall growth targets, without allowance for the damage specific to Plus business.

  - Mr. Ware's testimony indicates that the system made no quota adjustments for product availability issues or the like.  He said that a manager and Regional Vice President would have authority to make quota adjustments for local circumstances. There is no indication in his testimony that local adjustments were made to account for issues affecting Plus sales.

18

*Discussion of Issue 3*

As noted in the discussion of Issue 2 above, it is not a simple undertaking to integrate two sales forces following the acquisition of one orthopedic company by another. If milestones are delayed, the delay can generate new issues that might not otherwise have arisen. Here, there are signs that difficult decisions regarding Plus agents were not made as quickly as planned, and that as the delays accumulated, so did the ill effects. For instance, as contract discussions continued without resolution, the time frame for having two parallel agencies representing the same company in the same accounts also extended. This extension in turn highlighted incompatibilities between the Smith & Nephew and Plus systems. For example, different product numbers raised billing issues and complicated both product ordering and recall managment; quotas set by algorithm did not comport with Plus contract provisions; iPAQs were not shared; communications between Memphis and the Plaintiffs' offices were not consistent; cross-training did not commence with the Plaintiffs' groups; compliance training was not undertaken. The delays show that attempting to run parallel sales organizations quickly becomes untenable from a business standpoint – unacceptable to customers, an obstacle to completion of the sales force integration plan, and a source of distress for those caught in it.

Method of Analysis: In developing my conclusions on industry practice with regard to sales force integration, I looked mainly to publicly available information on the Zimmer acquisition of Centerpulse. That acquisition integrated a company approximately three times the size of Plus measured by revenue, and so there are undoubtedly important differences as to staffing and resourcing commensurate with the difference in scale. I would expect less significant differences in the degree of planning and the attention to detail in execution, on the principle that whether we are building a small house or a large one, we are still building a house. The attached Exhibit B shows slides from Zimmer's presentation to an external audience approximately eight weeks out from the beginning of integration activities. The slides offer useful insight into the approach toward the integration, some of the overall

19

goals, the phases of the process, and some indication of the time frame specific to the US sales force integration. I used the slides as points of reference regarding the treatment of the Plus agents – some of whom were former Centerpulse agents and had been through that integration process. A McKinsey Quarterly article offered some general observations about sales force integration, emphasizing its difficulty and its importance.

- An unspoken motive behind the Zimmer slides is that this public company has made promises to its shareholders regarding their return on Zimmer's investment in Centerpulse. That translates into the twin themes of speed and control.

  ○ Applied to sales force integration, this means that agents of the acquired company must be handled cost-effectively and without delay, so that disputes are managed and competitors are unable to poach the business.

- The first slide lists "observations" that include a series of bullet-point "integration principles."

  ○ One of these is "fairness," acknowledging that the integration will force unplanned changes on some individuals and businesses, and reminding the integration team not to abuse their authority in dealing with the acquired company. Applied to the sales force integration, this means being even-handed in placements and buy-out offers, among other things. It does not mean trying to make everyone happy.

  ○ Another is "best athlete" which indicates openness to choosing the best performer for a given spot, regardless of whether they come out of the acquirer or the acquired company. Translated to sales force integration, this means evaluating two overlapping sales agencies on their merits, without an automatic bias in favor of the existing agent; the same for regional vice presidents and individual representatives.

  ○ The notation under "Outcomes," to "Generate cash from synergies" refers in part to the idea

20

that if acted on quickly, the beneficial cost savings can help pay for the acquisition. Adequate funding and staffing also contribute to effective execution.   Conversely, delays can cause dis-synergies to mount, and execution to be less effective.

- Unexpected early dis-synergies are noted in a Smith & Nephew business report regarding the Plus acquisition, but it is not clear whether the company attributed the dis-synergies to slower-than-expected pace of integration.

- The "Integration Objectives" slide elaborates on themes critical to sales force integration.
    - First principle, top priority, and top of the slide: "Seamless customer transition – sales and surgeon" requires staying focused on the customer's requirements.  That includes understanding the relationship and loyalty between surgeon and agent, and not underestimating the "stickiness" of the business.  This is not always easy to gauge.

    - "Clear leadership and communication to all stakeholders" is significant for putting leadership and communication together in one bullet.  Do not dither and do not let agents or reps or back office staff stew in isolation.

    - "Move with speed – make tough decisions early" acknowledges that delay generally makes a difficult situation worse, and that the lesser of the evils is usually to step in and make a decision, rather than let the problem fester.  For example, if there are not enough agent spots for all the talented people you'd like to appoint, choose expeditiously and fairly, and be prepared to let some desirable customers walk away.  Don't let agent contract negotiations bog down.

- "Where Are We in the Process?" summarizes whole categories of milestones organized into phases.  It was important for people to know that there was a plan and to see that there was a plan.

21

- Timing: The "US Sales Force Integration" slide offers a status report at about eight weeks out.

  ○ "Distributor negotiations and re-alignments complete"  It was a top priority to get the structures in place and not leave any of the agents hanging; partly in fairness to the agents and their staff, and partly for the sake of the customers.  Here, "distributor" refers to the individual or the partners who are the principals in the sales agency.

  ○ "Combined sales force effective January 1st, 2004"  At the time of this report, still about five months away.  Here the scope and scale of the integration dictate the time frame for placement or termination of individual reps and cross-training a thousand people on both product lines.

  ○ "Single billing system to go live April 1st , 2004"  At the time of this report, still about nine months away.  This time frame may also reflect the sheer number of transactions involved, as well as older, nonSAP-based systems.  Still, the company was content to put this toward the back of the first year's milestones, in part to avoid confusion on the hospital side – there would still be one vendor for each product and the invoice would match the implant sheet – until the boxes, stickers, implant sheets and catalogs could be coordinated.

  ○ "1000 attendees to first national sales meeting" emphasizes execution of the integration plan.

- The slides convey some sense of industry practice in handling agents of an acquired company, although not in detail for a public audience.  Some of the principles have already been noted as best practices because they have not been well observed – notably "best athlete" and by some accounts, "fairness."  The slide noting "re-alignments" also puts the best face on an inherently difficult set of choices.

  ○ All of these reflect the problem of overlapping territories and customer relationships, and

22

the unavoidable comparisons to see which of two agents will continue, and which will be offered at best a partnership, a subordinate position, or a buy-out.


_____R. Bruce Phillips_____

16 June 2010

23

## EXHIBIT A

### Change In Control of Plus

In the event of a sale of all of the assets of Plus, the merger of Plus into another company or the sale or exchange of more than 50% of the stock of Plus during any 2 year period (other than a recapitalization or restructuring in which the direct or indirect change in control of Plus is less than 50%), any successor company created by such sale, merger or other change in control ("Successor Company") shall have the obligation to provide Representative with a comparable designation to that provided to Representative in this Agreement. If Representative believes that Representative has not been comparably designated by the Successor Company, Representative shall provide written notice of the perceived inadequate terms of the designation within 30 days of the designation from the Successor Company. Upon receipt by the Successor Company of such notice, the Successor Company shall have 30 days to re-designate Representative. In the event that Representative believes that such re-designation is still not a comparable designation, Representative shall provide written notice to the Successor Company within 10 days of Representative's receipt of such re-designation. Upon receipt of such notice from Representative, the Successor Company shall have the option to arbitrate Representative's designation in San Diego, California, in accordance with the rules of the American Arbitration Association. Upon receiving the arbitrator's decision, Successor Company shall either re-designate Representative in accordance with the terms of arbitrator's ruling, or, in the alternative, shall pay Representative an amount equal to 150% of the total sales by Representative of Product in the Representative Territory during the previous 12 months.

24

**EXHIBIT B**

Excerpts from Zimmer presentation to external audience regarding Centerpulse acquisition, describing status approximately eight weeks out.



Zimmer Holdings, Inc., SEC Rule 425 Business-Combination Communication Transaction, 13 January 2004, SEC File 1-16407, at page 32

25

## Integration Objectives

- Seamless customer transition——sales and surgeon

- Clear leadership and communication to all stakeholders

- Adopt the best of both cultures——choose "best athlete"

- Move with speed——make tough decisions early

- Achieve targeted synergies

- Reward and recognize contributions

Zimmer Holdings, Inc., SEC Rule 425 Business-Combination Communication Transaction, 13 January 2004, SEC File 1-16407, at page 33

26

00030



Zimmer Holdings, Inc., SEC Rule 425 Business-Combination Communication Transaction, 13 January 2004, SEC File 1-16407, at page 34

27

00031

## Sales Integration Plan

US Sales Force Integration

- Distributor negotiations & re-alignments complete

- Inventory & asset verifications in progress

- Combined sales force effective January 1st, 2004

- Single billing system to go live April 1st, 2004

- US Sales VP appointed but U.S. President resigned

- 1,000 attendees to first National Sales Meeting

- Product cross training program underway

Zimmer Holdings, Inc., SEC Rule 425 Business-Combination Communication Transaction, 13 January 2004, SEC File 1-16407, at page 37

28

00032

# EXHIBIT 3

**Supplement to**

**Report of R. Bruce Phillips**

**16 July 2010**

In his report of June 29, 2010 (the Wallace Report), Defendants' damages expert has offered a rebuttal to certain points expressed in my Report of June 16. I believe we seek to be helpful to the trier of fact in different ways. My report reflects experience within the orthopedic medical device industry and addresses a set of questions going to liability rather than damages.

Regarding Rebuttal Point 1: The Wallace report concludes that "it does not appear that the setting of the quota was unfair to Ortho Cala / Mr. Adams or caused him to fail to attain his quota." This misses the point. The difficulty lies in abruptly terminating Mr. Adams' contract for not hitting a number that he was told to ignore. Such an abrupt reversal is not a common industry practice, in my experience, as it would tend to diminish the agent's incentives to invest time and effort in business development.

Regarding Rebuttal Point 3: The Wallace Report provides a more precise statement of 2007 sales and quota figures for ORS / Tufts than the "range" noted in my report – a range that had the unintended effect of overstating the margin by which ORS exceeded its quota for 2007. Even so, the Wallace Report figures support the point that ORS met its 2007 quota and earned an automatic one-year extension of its contract for calendar year 2008.

The Wallace Report questions my analysis of the decline in ORS sales for 2007, by pointing out that my report did not "note that sales in 2007 were declining significantly as compared to 2006 before the acquisition *was completed* in June 2007." (Emphasis added.) In fact, Exhibit 2 - ORS / Steven Tufts of the Wallace Report appears to show that sales for January and February of 2007 exceeded sales

1

for the same months of 2006. The trend then reverses in March 2007 – after the acquisition was announced. It is at the time of the announcement that customers begin to ask questions about the future of the company being acquired. Customer uncertainty is a known risk following the announcement of an orthopedic company acquisition – a particularly acute risk in this industry, due in part to surgeons' concern for their patients, as the Wallace Report acknowledges (Wallace Report at 4-5), and to the surgeons' working relationships with their local orthopedic sales agents.

As indicated in the Zimmer slides (Phillips Report Exhibit B), "critical focus on customers" and "clear leadership and communication to all stakeholders" are of paramount importance in addressing known risks, such as customer uncertainty, during the course of the integration. In the context of sales force integration, these principles are largely directed toward retaining customers of the target company and thereby preserving its revenue stream. If communications from the target company and the acquirer do not reassure customers, a competitor may turn their doubts to its advantage. Here, for example, a Plus employee reported to the President of Plus, Craig Grabell, the concerns of a consulting surgeon (Dr. Feign) following the acquisition announcement, "due to lack of S&N communication directly with him." (Clay Smith memorandum, April 26, 2007; Doc. No. SN-ESI-413116) The same memorandum indicates that a number of Plus surgeons had not yet decided whether to use Smith & Nephew products; that they planned to base their decision on the future of their Plus agent with Smith & Nephew; and that they were awaiting communication from the company in that regard. Accordingly, the observed ORS sales trend in 2007 is consistent with Mr. Tufts' view that Defendants' actions and inaction damaged his business.

Regarding Rebuttal Point 6: The Wallace Report states as a general principle "To the extent in-place agreements will terminate within short periods of time, it would not be prudent to buy-out the sales agents at any substantial amount." In the orthopedic industry, this principle is commonly balanced with other factors, such as, for example, a departing agent's ability to take customers with him, in

2

which case a buy-out offer may have some utility in consideration for an extended, post-term non-competition covenant.

The Wallace Report faults my discussion of buy-outs for not addressing how a company should end its relationships with agents whose contracts "terminate or are terminable within a very short period after the acquisition (such as Ortho Cala / Mr. Adams, PMI / Mr. C. Nichols, and POMI/Bonamarte);" however, that is not the case here:

- The initial term of the Ortho Cala agreement ran to June 30, 2009, and the agreement was not terminable for convenience until 60 days before the end of the term. It had approximately two years left to run as of June 2007 unless it could be properly terminated for cause. As both my report and the Wallace report have noted, the purported rationale for early termination of the Ortho Cala agreement is in dispute.

- The initial term of the PMI agreement ran to December 31, 2008, and could only be terminated for cause during that period. It had approximately 18 months left to run as of June 2007.

- The Wallace report does not mention the ORS / Tufts agreement in this rebuttal point. For comparison, the initial term of the ORS agreement ran to July 31, 2008 and would then renew automatically for successive periods of one calendar year, unless terminated for cause. "Cause" included failure to meet quota, as measured over the course of a one-year quota period.

In the context of orthopedic sales agency agreements, the Ortho Cala, ORS, and PMI contract periods can hardly be characterized as "very short" – whether measured as a fraction of the term or by the potential revenue represented. Moreover, it is difficult for a prudent business enterprise to maintain separate, parallel sales forces over these spans of time, as demonstrated by the consequences of isolating the Plaintiffs from the rest of the company. In that regard, even a six-month period is not insignificant. As noted in the Zimmer slides (Phillips Report Exhibit B), it is important to "move with

3

speed – make tough decisions early." This was a key technique for identifying and managing risks inherent in sales force integration. Zimmer stated that "distributor negotiations and territory realignments [were] complete" approximately eight weeks into execution of the integration plan (Phillips Report Exhibit B).

R. Bruce Phillips

16 July 2010

4

# EXHIBIT 4

1    David J. Noonan (55966)
     dnoonan@knlh.com
2    Lauren E. Butz (246668)
     lbutz@knlh.com
3    Kirby, Noonan, Lance & Hoge, LLP
     350 Tenth Avenue, Suite 1300
4    San Diego, California 92101
     Telephone: (619) 231-8666
5    Facsimile: (619) 231-9593

6    Mitchell A. Kramer (Pro Hac Vice Pending)
     mkramer@kramerandkramer.com
7    Kramer & Kramer, LLP
     1077 Rydal Road, Suite 100
8    Rydal, PA 19046
     Telephone: (215) 887-9030
9    Facsimile (215) 887-9240

10   Barbara H. Kramer (Pro Hac Vice Pending)
     bkramer@kramerandkramer.com
11   Kramer & Kramer, LLP
     24 Frank Lloyd Wright Drive
12   Lobby D
     Ann Arbor, MI 48105
13   Telephone: (734) 930-5452
     Facsimile (734) 665-8788

14
15   Attorneys for Plaintiffs

16                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF CALIFORNIA
17   
18   MEDICAL SALES & CONSULTING          )
     GROUP, *et al.*                     )
19                                        )
            Plaintiffs                   )
20                                        )      Case No: 08-cv-1595 BEN BLM
         vs.                             )
21                                        )
     PLUS ORTHOPAEDICS USA, INC.,        )
     SMITH & NEPHEW, INC., *et al.*      )
22                                        )      PLAINTIFFS' RULE 26(a)(1) INITIAL
                                          )      DISCLOSURES
23          Defendants                   )

24
25        Plaintiffs submit the following initial disclosures based on the information currently
26   available in compliance with Federal Rule of Civil Procedure Rule 26(a)(1)(A)-(D):
27   
28
     ────────────────────────────────────
              Case No: 08-cv-1595 BEN BLM
         PLAINTIFFS' RULE 26(a)(1) DISCLOSURES
                         1

00039

## I.   Individuals Likely to Have Discoverable Information:

The following individuals are believed to have information Plaintiffs may use to support the claims and allegations in their complaint:

A.   Medical Sales & Consulting Group and Martin Nichols

    1.   Marty Nichols c/o Kramer & Kramer, LLP

        Information regarding the allegations of the Complaint

    2.   Employees or former employees of Defendants:

        Craig Grabell -Facts regarding actions of Defendants

        Sean Gabriel  - Facts regarding Defendants' relationship with Dr. Goldberg

    3.   Physicians:

        Tyler Goldberg, M.D., 4700 Seton Center Pkwy, Suite 200, Austin, TX 78759

        Information regarding Defendants' actions and damages to Plaintiff.

    4.   Expert witnesses to be designated concerning damages and the nature and operations of a manufacturer of medical devices

B.   Precision Orthopedics Midwest and Cindy and Emmett Bonamarte

    1.   Emmett Bonamarte c/o Kramer & Kramer, LLP

        Cindy Bonamarte c/o Kramer & Kramer, LLP

        Larry Lampasona c/o Kramer & Kramer, LLP

        Mark Harris c/o Kramer & Kramer, LLP

        The above are employees or principals of Plaintiff with information regarding the allegations of the complaint, Defendants' actions and damages caused to Plaintiff.

00040

2.    Employees or former employees of Defendants:

Mark Distin, 1253 Blooming Field Dr., Whitewater, WI. 53190

Tim Stacy, Smith and Nephew

Clay Smith, Plus Orthopedics

Craig Grabell, Plus Orthopedics

David Lorenzie, Plus Orthopedics

Pat Makris, Smith & Nephew

Steve Scott, Smith and Nephew

Tammy Wakefield, Smith & Nephew

Pam Segundo, Smith and Nephew

Lauri Perkins, Neubauer Perkins

Barbara Longo, Smith and Nephew

Joel Zettl, Plus Orthopedics

Charles Guthrie, Smith and Nephew

The above have information regarding the actions of Defendants.

3.    Surgeons and Hospital Employees:

James Hill MD, Northwest Community Hospital

Phillip Ludkowski MD, Northwest Community Hospital

David Chang M.D., Central DuPage Hospital

David Watt MD, Central DuPage Hospital

Kathy Machut, Northwest Community Hospital

Joe Stanley, Northwest Community Hospital

Kathy Ray, Northwest Community Hospital

Ruth Mau, Northwest Community Hospital

John Gurr, Northwest Community Hospital

The above have information regarding Defendants' actions and damages to Plaintiff.

4. Expert witnesses to be designated concerning damages and the nature and operations of a manufacturer of medical devices

C.   Orthocala, Inc. and Kent Adams

1. Kent Adams c/o Kramer & Kramer, LLP

Information concerning the allegations of the complaint

2. Employees or former employees of Defendants:

Tom Hooten, 2236 Seton, Largo, FL 33774

C. Steven Daniel, 905 US Hwy 301, Tampa, FL 33619

William Connelly, 815 Capington Lane, Marvin, NC 28173

Tom Prokop, 175 Paramount Dr., Raynham, MA 02767

Mark Langley, Smith & Nephew

Craig Grabell, Smith & Nephew

Tim Fransden, Smith & Nephew

The above have information regarding the actions of Defendants and the contract with and termination of Plaintiff.

3. Physicians:

Dennis T. Alter, M.D., 21 Hospital Drive, Suite 110, Palm Coast, FL 32164

Ronald Bathaw, M.D., 80 Pinnacle Drive, Suite 700 / Bldg. B, Palm Coast, FL 32164

James B. Duke, M.D., 2300 SE 17th Street, Bldg. 500, Ocala, FL 34471

Wagdi F. Faris, M.D., 2727 SE Maricamp Rd., Ocala, FL 34471

00042

E. David Risch, M.D., 201 Health Park Blvd., Suite 101, St. Augustine, FL 32086

The above have information regarding Defendants' actions and damages to Plaintiff.

   4.   Expert witnesses to be designated concerning damages and the nature and operations of a manufacturer of medical devices

D.   ORS, Inc. and Steven Tufts

   1.   Employees of Plaintiff:

   Greg Dupont, c/o Kramer & Kramer, LLP

   Joseph Dupont, c/o Kramer & Kramer, LLP

   Craig Walejko, c/o Kramer & Kramer, LLP

   Steve Tufts, c/o Kramer & Kramer, LLP

   The above have information concerning the allegations in the complaint.

   2.   Employees or Former Employees of Defendants:

   Craig Grabell, 4725 Calle Quetzal Suite B, Camarillo, CA 93012

   Charles Guthrie, Smith & Nephew

   John Clausen, Smith & Nephew

   Tim Frandsen, Smith & Nephew

   The above have information regarding the actions of Defendants.

   3.   Physicians:

   Dr. Richard Santore

   Dr. Mike Muldoon, 7910 Frost St Suite 200, San Diego, CA 92123

   Dr. Heinz Hoenecke, Scripps Green Hospital, 10666 N. Torrey Pines Rd., LaJolla, CA  92037

00043

Dr. Thomas Peters, 167 Main St., Tuba City, AZ  86045

Dr. Gary Purcell, 4566 E. Inverness, Mesa, AZ  85206

Dr. Blake Stamper, 2000 Highway 95 Suite 200, Bullhead City, AZ 86442

The above have information regarding Defendants' actions and damages to Plaintiff.

4.     Expert witnesses to be designated concerning damages and the nature and operations of a manufacturer of medical devices

E.     Precision Medical, Inc. and Chris Nichols

1.     Employees of Plaintiff:

Chris Nichols c/o Kramer & Kramer, LLP

Cali Nichols c/o Kramer & Kramer, LLP

Jeff Myers, 115 Canon Ave., Unit 6, Manitou Springs, CO 80829

Greg Goodwater, Kramer & Kramer, LLP

Scott Colby, Steamboat Springs, CO

The above have information regarding the allegations of the Complaint.

2.     Employees or Former Employees of Defendants:

Brad DeSault, Smith & Nephew

Barbara Longo, Smith & Nephew

Suanne Stobaugh, Smith & Nephew

Tim Frandsen, Smith & Nephew

Clay Smith, Smith & Nephew

Charles Guthrie, Smith & Nephew

The above have information regarding the actions of Defendants.

Jeremy Smith, Grand Junction, CO.

The above has information regarding failure to obtain sales at Grand Junction Hospital System.

Andrew Holman, Smith & Nephew

The above has information regarding unilateral modification of Plaintiff's territory.

3.   Physicians and hospital personnel:

Dr. Mark Fitzgerald, 1400 S. Potomac, Aurora, CO 80012

Dr. Michael Feign, 175 S. Union Blvd., Suite 200, Colorado Springs, CO 80910

Dr. Craig Loucks, Peak Orthopedics, 14100 S. Arapahoe Rd., Suite B370, Centennial, CO 80112

Dr. Robert Greenhouse, Peak Orthopedics, 14100 S. Arapahoe Rd., Suite B370, Centennial, CO 80112

Amber Stevens, Health One

Dr. Orderia Mitchell, 175 S. Union Blvd., Suite 200, Colorado Springs, CO 80910

The above have information regarding Defendants' actions and damages to Plaintiff.

4.   Expert witnesses to be designated concerning damages and the nature and operations of a manufacturer of medical devices.

F.   Each plaintiff reserves the right to rely on information of individuals identified by any other plaintiff.

G.   Formal discovery has not commenced in this case and Plaintiffs'

00045

1   investigation is ongoing.  The witnesses provided are based upon the information and documents
2   presently available and specifically known to Plaintiffs.  As a result, Plaintiffs reserve the right,
3   as discovery continues, to add additional witnesses and/or modify the subjects of information
4   provided for each witness.  In addition, Plaintiffs reserve the right to call as witnesses those other
5   persons disclosed by Defendants in connection with this action.

6   **II.    Documents in Plaintiffs' Possession in Support of the Allegations and Claims**
7   **in the Complaint**

8        The following is a description of certain documents in Plaintiffs' custody or control
9   which they may use to support the claims and allegations in their complaint:

11        A.    Medical Sales & Consulting Group and Martin Nichols
12             •    E-mails between parties
13             •    Letters between parties
14             •    Agreement between parties
15             •    Reports concerning Plaintiff's financial relationship with
16                  Defendant
17             •    Defendant's Code of Business Principles
18             •    Plaintiff's financial documentation
19             •    Documents from Defendants and Plaintiff dealing with product
20                  recalls
21        B.    Precision Orthopedics Midwest and Cindy and Emmett Bonamarte
22             •    E-mails between parties
23             •    Letters between parties
24             •    Plaintiff's handwritten notes concerning relationship with
25                  Defendant

00046

- Business forms
- Spreadsheets regarding Plaintiff's financial relationship with Defendant
- Commission worksheet
- Defendant's Code of Business Principles
- Plaintiff's financial documentation
- Documents from Defendants and Plaintiff dealing with product recalls

C.    Orthocala, Inc. and Kent Adams

- E-mails between parties
- Letters between parties
- Plaintiff's handwritten notes concerning relationship with Defendant
- Agreements between parties
- Reports regarding delivered goods
- Spreadsheet of sales performance
- Screen shot of SAP regarding invoice
- Defendant's Power Point Presentation to Plaintiff
- Code of Ethics of Advanced Medical Technology Association concerning Interactions with Health Care Professionals
- Defendant's Code of Business Principles
- Implant usage ticket
- Plaintiff's financial documentation
- Documents from Defendants and Plaintiff dealing with product recalls

00047

D.   ORS, Inc. and Steven Tufts

- E-mails between parties
- Letters between parties
- Agreement between parties
- Spreadsheets regarding Plaintiff's financial relationship with Defendant
- Reports concerning Plaintiff's relationship with Defendant
- Defendant's Code of Business Principles
- Plaintiff's financial documentation
- Documents from Defendants and Plaintiff dealing with product recalls

E.   Precision Medical, Inc. and Chris Nichols

- E-mails between parties
- Letters between parties
- Agreements between parties
- Plaintiff's purchase order
- Spreadsheets regarding Plaintiff's financial relationship with Defendant
- Code of Ethics of Advanced Medical Technology Association concerning Interactions with Health Care Professionals
- Defendant's Code of Business Principles
- Plaintiff's financial documentation
- Documents from Defendants and Plaintiff dealing with product recalls

F.   Each Plaintiff reserves the right to rely/or/and utilize documents of any

00048

1   other Plaintiff and documents produced by Defendants in this action.

2   **III.     Computation of Damages**

3       A.     Medical Sales & Consulting Group and Martin Nichols
4              <u>(collectively Medical Sales & Consulting or Plaintiff)</u>

5   Plaintiff Medical Sales & Consulting's damages in this case consist of:

6       Unpaid commissions on sales of Defendants' products into Plaintiff's territory to which

7   Plaintiff is contractually entitled to commissions including commissions on products utilized by

8   Dr. Goldberg, sales of Polar Cup, and sales in connection with the use of the Galileo system by

9   other doctors.

10      Unpaid commissions on sales Plaintiff could have made in its territory but for the actions

11  and inactions described in the complaint, including defendants impairing Plaintiff's access to

12  instruments and the Galileo device.

13      Plaintiff anticipates that the calculation of damages will require expert analysis.

14      Additional damages include interest, counsel fees, and other amounts disclosed in

15  discovery.

16      B.     Precision Orthopedics Midwest and Cindy and Emmett Bonamarte
              <u>(collectively Precision Orthopedics Midwest or Plaintiff)</u>

17      Precision Orthopedics Midwest's damages in this case are calculated as 150 percent of its

18  2007 sales of Defendants' products plus statutory interest, counsel fees and exemplary double

19  damages under the Wisconsin Sales Representative Law.

20      Plaintiff was not paid for surgical instruments, valued at approximately $20,000.00,

21  which it turned over to Defendants at the end of their relationship.

22      Plaintiff's damages may also, or in the alternative, consist of lost commissions resulting

23  from Defendants' actions and inactions as described in the complaint which damaged Plaintiff's

24  ability to sell Defendants' products and caused Plaintiff to lose sales; and unpaid commissions

25  for sales of all products to which Plaintiff is contractually entitled to commissions.

26

27

28

00049

1   The calculation of damages may require expert analysis.

2       Additional damages include interest, counsel fees, and other amounts disclosed in

3   discovery.

4       C.   Orthocala, Inc. and Kent Adams (collectively Orthocala or Plaintiff)

5       Orthocala's  damages constitute unpaid commissions from Defendants' failure to pay

6   commissions on all products that Plaintiff was contractually permitted to sell; lost commissions

7   from Defendants' actions and inactions as pled in the Compliant which impaired Plaintiff's

8   ability to sell Defendant's product; lost commissions on sales by Defendants or their agents into

9   Plaintiffs' territories from the time of Orthocola's improper termination as Plus' agent in

10  northern Florida, southern Alabama and applicable portions of Georgia until June 30, 2009.

11      Orthocala is entitled to additional damages, costs and counsel fees pursuant to the Florida

12  Sales Representative Act.

13      Plaintiff anticipates that the calculation of damages will require expert analysis.

14      Additional damages include interest, counsel fees, and other amounts disclosed in

15  discovery.

16      D.   ORS, Inc. and Steven Tufts (collectively ORS or Plaintiff)

17      ORS's damages constitute lost commissions from Defendants' failure to pay

18  commissions on all products that Plaintiff is contractually permitted to sell and damages resulting

19  from the precipitous decline, rather than predictable increases in sales of Defendants' products as

20  a result of Defendants' actions and inactions as described in the complaint, which damaged

21  Plaintiff's ability to sell Defendants' products.  Plaintiff was further damaged as a result of

22  Defendants failing to provide sufficient access to Galileo devices in Plaintiff's territory and

23  failing to provide and pay commissions on the sales of Polar Cups.

24      Plaintiff's contract provided for automatic annual renewals unless terminated for specific

25  cause.  Plaintiff anticipates that the calculation of damages will require expert analysis.

26

27

28

00050

1   Additional damages include interest, counsel fees, and other amounts disclosed in

2   discovery.

3       E.       Precision Medical, Inc. and Chris Nichols (collectively
                  Precision Medical or Plaintiff
4

5   Precision Medical's damages comprise lost commissions from Defendants' failure to pay

6   commissions on all products that Plaintiff is contractually permitted to sell in its entire territory,

7   and damages resulting from the precipitous decline, rather than predictable increases in sales of

8   Defendants' products as a result of Defendants' actions and inactions as described in the

9   complaint, which damaged Plaintiff's ability to sell Defendants' products.  Plaintiff was directly

10  damaged as a result of Defendants' failure to provide Galileo devices for Plaintiff's territory, and

11  failure to provide and pay commissions on the sales of Polar Cups.  Plaintiff lost sales and

12  commissions as a result of Plaintiff's reliance on Defendants' promise to give Plaintiff a contract

13  to also represent Smith & Nephew's products in Plaintiff's territory; as well as Defendants'

14  improper reduction of Plaintiff's territory.

15      Plaintiff's contract runs until December 31, 2008.  The calculation of the amount of

16  damages will probably require expert analysis.

17      Additional damages include interest, counsel fees, and other amounts disclosed in

18  discovery.

19  **IV.   Insurance Agreements**

20      There are no known applicable insurance agreements pursuant to

21  Fed.R.Civ.P.26(a)(1)(iv) and 34.

22

23

24

25

26

27

28

DATED: November 13, 2008

Respectfully submitted,

KRAMER & KRAMER, LLP

By: _____
Mitchell A. Kramer

KIRBY, NOONAN, LANCE & HOGE, LLP

BY:  David J. Noonan

OF COUNSEL:

David M. Blanchard
Nacht & Associates, P.C.
101 N. Main Street, Suite 555
Ann Arbor, MI  48104
(734) 663-7550
(734) 663-7592 fax

00052

## CERTIFICATE OF SERVICE

I, Darlene Lubienski, hereby certify that on November 13, 2008 I emailed and mailed, postage prepaid, Plaintiffs' Rule 26(a)(1) Initial Disclosures to the following parties:

Noah A. Katsell
DLA Piper US LLP
401 B Street, Suite 1700
San Diego, CA 92101
noah.katsell@dlapiper.com

John F. Dienelt
DLA Piper US LLP
500 8th Street
Washington, DC 20004
john.dienelt@dlapiper.com


Darlene Lubienski

# EXHIBIT 5

Report of
Robert H. Wallace
Expert Witness
For
Plus Orthopaedics, LLC
(Previously Plus Orthopedics USA, Inc.)
and
Smith & Nephew, Inc.


In the Matter of
Medical Sales & Consulting Group, et al
v.
Plus Orthopedics USA, Inc.
and
Smith & Nephew, Inc.

Case No. 08-CV-1595 BEN BLM
United States District Court
For the Southern District of California


June 29, 2010


*Confidential – Attorneys' Eyes Only*

significant expansion of the infrastructure of ORS and the cost of this expansion is not indicated by the past operating costs of ORS. In addition, there is no evidence that Mr. Tufts had the capability to manage an entity of the size projected in the Gordon Reports. In conclusion, the claim of ORS for lost profits on Smith & Nephew sales is completely unfounded based on both the sales agent agreement between Plus and ORS and the reasonable economics of the situation.

In addition, the Gordon Reports fail to discount the future lost profits of ORS related to Smith & Nephew sales to present value using a discount rate commensurate with the risk related to the cash flows, which is required for the proper quantification of damages related to future periods and is a fundamental calculation for an experienced damage expert. The future lost profits opined upon by the Gordon Reports would be substantially reduced when discounted to present value using an appropriate discount rate, which would likely be in excess of 20 percent.

X       Rebuttal of the Phillips Report

The Phillips Report appears to principally consist of: "argument" based on the claims and representations made by the plaintiffs in this matter; opinions on quotas that fail to actually arrive at a quantifiable result; and a recitation of an integration plan undertaken by Zimmer in one specific acquisition, which does not establish industry practice. I have noted below certain criticisms and opinions I have regarding the Phillips Report.

1.  The Phillips Report appears to criticize the setting of quotas for ORS/Mr. Tufts and Ortho Cala/Mr. Adams, implying that excessive quotas caused these two plaintiffs to fail to attain their quotas. Ortho Cala/Mr. Adams never sold Plus products at a level close to its quota, but it appears the quota disputed is the one set for 2007. As is discussed in Section VIII of this report, Ortho Cala had only attained sales equal to less than 40 percent of its quota for 2007 prior to the acquisition of Plus. In addition, the 2007 quota for Ortho Cala was at a level less than the 2006 quota annualized. Therefore, it does not appear that the setting of the quota was unfair to Ortho Cala/Mr. Adams or caused him to fail to attain his quota.

As for ORS/Mr. Tufts, as discussed in Section IX of this report, ORS reached its 2007 quota even as its sales began to decline sharply before the acquisition of Plus by Smith & Nephew and ORS would not have attained its quota for 2008 even if the quota was set at the level suggested by Mr. Tufts of $1.2 million, which would have

00056

been a 50 percent reduction from the 2007 quota.

2. The Phillips Report analysis and interpretation in regard to POMI/Bonamarte and the change in control provision fails to consider the fact that the POMI agreement was terminable by February 28, 2008, at which point, POMI would not retain their customer base for Plus products.  The Phillips Report claims that the Bonamartes' status was not substantively the same after the change in control as compared to before the change in control.[127]  Prior to June 2007 (which was before the change in control):  (1) POMI was a distributor of Plus products in which sales had declined over 22 percent for the first five months of 2007 versus 2006; (2) POMI was selling Omni Life Sciences products, which competed with Smith & Nephew products; and (3) POMI had a sales agreement that could be terminated as of February 28, 2008 without cause.  After May 2007 (after the change in control):  (1) the sales of POMI continued to decline; (2) POMI continued to sell Omni Life Sciences products, but at an increased level (although the plaintiffs have not provided sufficient information to determine the exact increase); and (3) POMI's sales agreement still could be terminated as of February 28, 2008 without cause.  In fact, in 2008, it appears that POMI earned more commissions from Omni Life Sciences than it had from selling Plus products in 2006 or 2007.

The Phillips Report states that "....limiting Bonamarte to selling only the legacy Plus products might disarm the second change-in-control trigger, but only if Bonamarte's status was substantively the same as before the change in control".[128]   It is my conclusion that the status of POMI/Bonamarte was substantively the same before and after the change in control and therefore,  according to the opinion expressed in the Phillips Report, the change in control would not be triggered, as is consistent with the interpretation of the change in control provision by Plus/Smith & Nephew. In addition, Plus/Smith & Nephew's offer to extend the sales agreement of POMI/Bonamarte was rejected by the Bonamartes, who did not want an extension, possibly because they were focusing on the sale of Omni Life Sciences products.

3. The Phillips Report indicates that ORS sales in 2007 are "in the range of $3 million" and the quota "stood in the range of $2 million".[129] In fact, ORS sales in 2007 were $2.671 million, not "in the range of $3 million" and the quota was $2.399 million, not "in the range of $2 million".  More important, the Phillips Report apparently failed to

---

[127] The Phillips Report, Page 11
[128] The Phillips Report, Page 11
[129] The Phillips Report, Page 17

00057

analyze the actual sales of ORS to note that sales in 2007 were declining significantly as compared to 2006 before the acquisition was completed in June 2007. In addition, as discussed above in Section IX, ORS failed to meet its own suggested quota of $1.2 million in 2008.

4. The Phillips Report claims, as its issue number 2, that quotas were set unreasonably high for Ortho Cala/Mr. Adams and ORS/Mr. Tufts, but never suggests what the quotas should have been. Ortho Cala (in 2007) and ORS (in 2008) missed their quotas by so much that it is likely they would have failed to attain any reasonably set quota.

5. The Phillips Report acknowledges that the quota for PMI/Mr. C. Nichols could be increased by 30 percent. In fact, the quota for 2008 for PMI/Mr. C. Nichols was only increased 8.9 percent. In addition, the sales of PMI were below its quota for the first five months of 2007, prior to the closing of the acquisition of Plus by Smith & Nephew.

6. The Phillips Report includes a discussion of buy-outs in the orthopedic medical device industry, but fails to consider how a prudent business enterprise such as Plus/Smith & Nephew should handle situations in which (1) the sales agents that are being replaced have contracts that terminate or are terminable within a very short period after the acquisition (such as Ortho Cala/Mr. Adams, PMI/ Mr. C. Nichols and POMI/Bonamarte); or (2) the sales agents are selling competing products at an increasing level such as PMI/Mr. C. Nichols or POMI/Bonamarte. To the extent in-place agreements will terminate within short periods of time, it would not be prudent to buy-out the sales agents at any substantial amount. In addition, consideration must be given in any buy-out discussion in the event that sales agents are properly or improperly selling competing products and diverting their sales efforts to the competing products.

Robert H. Wallace, CPA

39