1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MEDICAL SALES & CONSULTING
GROUP; et al.,

                                    Plaintiffs,

        vs.

PLUS ORTHOPEDICS USA, INC.; SMITH
& NEPHEW, INC.,

                                    Defendants.

CASE NO. 08cv1595 BEN (BGS)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW
FOLLOWING BENCH TRIAL**

# INTRODUCTION

Two Plaintiff groups remain in this litigation: (1) Precision Medical, Inc. and Chris Nichols ("Nichols"); and (2) Precision Orthopedics, Inc., Emmett Bonamarte, and Cindy Bonamarte ("Bonamarte").[1]  Plaintiffs, independent sales representatives and their companies, entered into sales agreements to sell Defendant Plus Orthopedics, LLC's medical implants in defined territories.  Nichols alleges that Defendants Plus Orthopedics, LLC and Smith & Nephew, Inc. ("Defendants") breached the express terms of his sales agreement, violated the covenant of good faith and fair dealing, and violated a state sales commission statute.  Bonamarte alleges that Defendants failed to pay him pursuant to a change-in-control provision in the sales agreement and violated state sales commission statutes.[2]

---

[1]All other Plaintiffs have been dismissed following settlement.

[2]The Court previously granted summary judgment in favor of Defendants on Plaintiffs' tort claims and limited Plaintiffs' breach of contract claim.

08cv1595

1    The Court held a five-day bench trial on June 21-24 and 28, 2011.[3]  Having weighed the

2    testimony and evidence introduced at trial and considered the parties briefs preceding, during, and

3    following trial, the Court issues the following findings of fact and conclusions of law pursuant to

4    Federal Rule of Civil Procedure 52(a).

5                            **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

6            The Court incorporates the facts stipulated to by the parties in the April 8, 2011 Pretrial

7    Order.  Plaintiffs entered into sales agreements with Plus to serve as independent sales agents for

8    Plus' medical implants.  Plaintiffs marketed and sold Plus products in their defined territories.

9    Plaintiffs were responsible for educating doctors about Plus' products, supplying doctors with the

10   products, and providing support services to doctors, including bringing necessary products and

11   instruments for implantation to surgery and providing technical advice about the use and

12   implantation of the products.  Under the terms of their respective sales agreements, Plaintiffs were

13   entitled to commissions on the sales of Plus products.  On June 1, 2007, Smith & Nephew acquired

14   Plus and succeeded to Plus' obligations under the sales agreements.[4]

15           Nichols' and Bonamarte's claims are significantly different and the Court's findings of fact

16   and conclusions of law reflect that difference.  Bonamarte claims that Defendants breached the

17   sales agreement by failing to pay him 150% of his prior 12-months' sales pursuant to the sales

18   agreement's change-in-control provision or provide a comparable designation.  Bonamarte also

19   claims that the 150% payment constitutes an unpaid commission.  Nichols claims that Defendants

20   breached express terms of the sales agreement by failing to provide technical expertise, soliciting

21   Nichols' sales force, failing to negotiate quota, and failing to timely pay commissions.

22   Additionally, Nichols claims that Defendants violated the covenant of good faith and fair dealing

23   by re-branding Plus products, excluding Nichols from meetings and trainings, depriving Nichols of

24

25           [3]Closing arguments were heard on August 2, 2011 and post-trial briefs were filed on September

26   9, 2011.

27           [4]Defendants did not argue on summary judgment, at trial, or in post-trial briefing or present any
     evidence that Smith & Nephew did not succeed to Plus' obligations under the sales agreements with
28   Smith & Nephew's acquisition of Plus.  The undisputed evidence supports Plaintiffs' assertion that
     Smith & Nephew did succeed to Plus' obligations under the contract, but the Court need not analyze
     the issue because Defendants have effectively conceded the issue.

sales information and needed supplies of products and instruments, denying sales support, and

halting new product development.

**I.        Bonamarte Findings of Fact**

Bonamarte entered into a sales agreement with Plus on August 1, 2003 to serve as the

exclusive sales representative of Plus products in Illinois.  The sales agreement contained a change-

in-control provision that provided as follows:

> In the event of a sale of all of the assets of Plus, the merger of Plus into another company or the sale or exchange of more than 50% of the stock of Plus during any 2 year period (other than a recapitalization or restructuring in which the direct or indirect change in control of Plus is less than 50%), any successor company created by such sale, merger, or other change in control ("Successor Company") shall have the obligation to provide Representative with a comparable designation to that provided to Representative in this Agreement.  If Representative believes that Representative has not been comparably designated by the Successor Company, Representative shall provide written notice of the perceived inadequate terms of the designation within 30 days of the designation from the Successor Company.  Upon receipt by the Successor Company of such notice, the Successor Company shall have 30 days to re-designate Representative.  In the event that Representative believes that such re-designation is still not a comparable designation, Representative shall provide written notice to the Successor Company within 10 days of Representatives' receipt of such re-designation.  Upon receipt of such notice from Representative, the Successor Company shall have the option to arbitrate Representative's designation in San Diego, California, in accordance with the rules of the American Arbitration Association. Upon receiving the arbitrator's decision, Successor Company shall either re-designate Representative in accordance with the terms of the arbitrator's ruling, or, in the alternative, shall pay Representative an amount equal to 150% of the total sales by Representative of Product in the Representative Territory during the previous 12 months.

While there are certainly deficiencies in the clarity of the steps, the Court has identified five

steps the parties were required to complete.

(1) Defendants provide Bonamarte with a comparable designation

(2) Bonamarte provides written notice of the perceived inadequate terms of the

designation within 30 days of the designation

(3) Defendants have 30 days to re-designate Bonamarte

(4) Bonamarte has 10 days from re-designation to provide written notice if Bonamarte

believes the re-designation is still not a comparable designation

(5) Upon receipt of notice from Bonamarte, Defendants have the option to arbitrate

the designation and upon receiving the arbitrator's decision, re-designate Bonamarte

1    in accordance with the arbitrator's ruling or pay Bonamarte 150% of the total sales

2    during the previous 12 months

3    **A.      Creation of the Sales Agreement**

4        The sales agreement was negotiated between Emmett and Cindy Bonamarte and David

5    Lorenzi, Chief Executive Officer of Plus.  While Mark Distin, a Regional Sales Manager and

6    Director of Sales for Plus, was involved in recruiting Bonamarte and engaged in communications

7    with Bonamarte, he testified that he did not negotiate or draft the sales agreement on behalf of

8    Plus.  Bonamarte insisted on the inclusion of the change-in-control provision and drafted the

9    provision, although Mr. Lorenzi negotiated the 150% of the prior months sales down from the

10   200% initially sought.  Bonamarte insisted on the inclusion of this provision to protect Bonamarte

11   in the event that Plus was acquired by another company.  The sales agreement did not contain a

12   non-compete clause.

13       "Comparable designation" is not defined in the sales agreement and it does not have a

14   commonly accepted definition in the industry.  The only industry expert to testify, Plaintiff's expert

15   R. Bruce Phillips, testified that the term is not generally used in the medical device industry and

16   that in his years in the industry he had never encountered this term in this industry.  Bonamarte

17   believed that a comparable designation would constitute the exclusive right to sell not only Plus

18   products in his territory, as he had before a change-in-control, but additionally, the exclusive right

19   to sell all the acquiring companies' products in that same territory, despite the acquiring company

20   having its own sales representative already selling the acquiring companies' products in that

21   territory.

22   **B.      Correspondence Concerning Comparable Designation**

23       Bonamarte was not immediately contacted by Smith & Nephew about his status following

24   the June 1, 2007 acquisition.  On August 10, 2007, Bonamarte sent an email to Defendants

25   expressing disappointment in not being offered the distributorship and requesting that Defendants

26   honor the buy-out clause of the sales agreement and pay Bonamarte one and one-half times his

27   sales over the past twelve months, approximately $1.9 million.  In this first communication,

28   Bonamarte did not attempt to address Defendants' obligation to provide a comparable designation.

1  Nor did he acknowledge Defendants' option to arbitrate, but rather immediately demanded the

2  150% of the prior 12-months' sales.  Having observed Bonamarte's demeanor, when considered

3  with the tenor and timing of this correspondence, the Court is left with the definite impression that

4  Bonamarte was not interested in a "comparable designation," but was more interested in going

5  straight to payment of 150% of the past 12-months' sales, which, as discussed below, would have

6  been a windfall.

7        On September 24, 2007, Defendants responded by email that Defendants would honor the

8  August 2003 sales agreement and that Bonamarte's status as a sales representative remained

9  unchanged.[5]  On September 27, 2007, Bonamarte sent a letter to Defendants indicating that a

10 comparable designation had not been provided, that the letter was providing written notice that

11 Defendants had not provided a comparable designation, and asserting that Defendants had thirty

12 days to re-designate Bonamarte.

13       On October 16, 2007, Defendants sent a letter to Bonamarte, asserting that the change-in-

14 control provision had not been triggered, but that if it had, a comparable designation was provided

15 in the September 27, 2007 email.  The letter then quotes the portion of the September 27, 2007

16 email that explained that Bonamarte's status remained unchanged and that Defendants would

17 continue to honor the contract.  The letter specifically goes on to "reiterate that Smith & Nephew

18 and Plus [would] honor the terms of the Agreement, and that your client remains a duly-authorized

19 sales representative subject to the terms of the Agreement until its expiration on December 31,

20 2007."  On December 6, 2007, Bonamarte sent a letter to Defendants disputing Defendants'

21 assertion that the sales agreement terminated on December 31, 2007, referenced the October 16,

22 2007 letter, and asserted that he had not received a comparable designation.  Bonamarte sent

23 another letter to Defendants on December 18, 2007 noting the sales agreement should run until

24 December 31, 2008 and asserting that he had not received the comparable designation required by

25 the sales agreement.  Defendants responded to the December 18, 2007 letter on December 26, 2007

26

27 ─────────────

28       [5]The email and numerous correspondence that followed state that Bonamarte's contract would
    expire on December 31, 2007.  Shortly after Bonamarte notified Defendants that the sales agreement
    should be renewed for an additional year on December 6, 2007, Defendants notified Bonamarte that
    the sales agreement was renewed an additional year.

1   and advised Bonamarte that the sales agreement was renewed for an additional year, expiring on

2   December 31, 2008.

3        Bonamarte responded to the December 26, 2007 letter on January 4, 2008 and again

4   claimed that Defendants had not provided the comparable designation required by the change-in-

5   control provision.  Defendants did not seek arbitration and Bonamarte was not paid 150% of his

6   prior 12-months' sales as demanded by Bonamarte.

7   **II.**      **Bonamarte Conclusions of Law**

8        Bonamarte alleges that Defendants failed provide him with a comparable designation or

9   payment of 150% of his prior 12-months' sales in breach of the sales agreements' change-in-

10   control provision.[6]  Bonamarte has failed to establish that Defendants breached the contract

11   because Bonamarte did not establish that he met his obligation under the sales agreements' change-

12   in-control provision.   Bonamarte also did not establish that the designation provided by

13   Defendants did not constitute a comparable designation.  Even if Bonamarte had complied with the

14   change-in-control provision's requirements and Defendants' breached by failing to provide a

15   comparable designation, Bonamarte would still not be entitled to the 150% payment because it

16   constitutes an invalid penalty.  Additionally, Bonamarte claims under the Wisconsin and Illinois

17   sales commission statutes also fail because they are based on an entitlement to the 150% payment.

18         **A.**     **Bonamarte Did Not Comply With the Requirements of the Change-in-Control**

19                  **Provision**

20        "It is elementary a plaintiff suing for breach of contract must prove it has performed all

21   conditions on its part or that it was excused from performance.  Similarly, where defendant's duty

22   to perform under the contract is conditioned on the happening of some event, the plaintiff must

23

24   _____

     [6]Based on the evidence put forth at trial and the record in this case, the Court finds that
25   Bonamarte has limited his claims in this action to violation of the change-in-control provision and
violation of the Wisconsin and Illinois sales representative laws.  Even if Bonamarte could pursue
26   claims on another basis, those claims would be precluded for failure to prove damages with any
certainty.  Although Bonamarte's expert testified that Bonamarte's sales declined for a certain period
27   following the acquisition, the expert testimony offered as to Bonamarte's damages was limited
calculation of 150% of a variety of 12-month periods' sales.  Bonamarte's expert did not even attempt
28   to offer testimony about the basis for Bonamarte's declining sales or control for other factors that
might have caused the decline as the expert did with regard to Nichols.

            08cv1595

1    prove the event transpired." *Consol. World Invs., Inc. v. Lido Preferred Ltd.*, 9 Cal. App. 4th 373,

2    380 (2nd Dist. 1992) (internal citations omitted).

3        Defendants' duty to pay Bonamarte 150% of his prior 12-months' sales was conditioned on

4    Bonamarte *timely* responding to designations he found unsatisfactory.  The parties each attempt to

5    plug the communications between the parties into steps most advantageous to each's position.  But,

6    as the finder of fact, the Court must weigh all the evidence, including the correspondence itself, the

7    timing of the correspondence, and the testimony of witnesses.  Based on all the evidence, the Court

8    must determine where the parties' correspondence fits within the numerous steps of the change-in-

9    control provision.  The Court finds as follows.

10       Defendants completed step one by providing Bonamarte with a comparable designation on

11   September 24, 2007 when Defendants indicated that Bonamarte's status as a sales representative

12   remained unchanged and Defendants would honor the contract.  This was indisputably the first

13   communication from Defendants to Bonamarte concerning Bonamarte's status following the

14   acquisition and treating it as the first designation is consistent with the time limits for response

15   articulated in Bonamarte's September 27, 2007 correspondence.  The Court rejects Bonamarte's

16   claim that this could not constitute a comparable designation because the designation indicated the

17   sales agreement expired on December 31, 2007.  The sales agreement does not indicate when the

18   sales agreement automatically renews for the additional year.  Additionally, Bonamarte's next

19   communication, disputing the designation, fails to identify the December 31, 2007 end date as an

20   inadequate term of the designation.

21       To comply with step two, Bonamarte had to provide written notice of the perceived

22   inadequate terms of the designation within 30 days.  Bonamarte met step two by responding on

23   September 27, 2007 and indicating that a comparable designation had not been provided, that the

24   letter constituted written notice that Defendants had not provided a comparable designation, and

25   asserted that Defendants had 30 days to re-designate.[7]

26   _____

27       [7]It is debatable whether this correspondence complies with the change-in-control provisions'
     requirement to provide written notice of the inadequate terms of the designation because it fails to
28   identify why Defendants' designation was inadequate.  However, because Defendants did not raise this
     issue and the Court finds that Bonamarte ultimately did not comply with his obligations under the

1    To comply with step three, Defendants had to re-designate Bonamarte within 30 days.

2   Defendants met step three with the correspondence dated October 16, 2007.  While Defendants did

3   claim that the change-in-control provision had not been triggered, Defendants also reiterated

4   Defendants' designation — honoring the August 2003 sales agreement.[8]

5    To comply with step four, Bonamarte had to provide written notice to Defendants within 10

6   days if he believed the re-designation was still not comparable.  Bonamarte did not comply with

7   the fourth step because his next correspondence to Defendants was not until December 6, 2007, 51

8   days later.  Because Bonamarte failed to provide written notice that the re-designation was still not

9   comparable within 10 days, Defendants' duty under step five to opt for arbitration and potentially

10   re-designate Bonamarte in conformance with that decision or pay 150% of the prior 12-months'

11   sales never arose.

12    Defendants only had a duty  to pay the 150% of sales for the prior 12 months if every prior

13   step, *i.e.* condition, was met.  Because Bonamarte did not meet his obligation under the sales

14   agreement, Defendants' duty to pay the 150% never arose.  *Consol. World Invs., Inc.*, 9 Cal. App.

15   4th at 380.  Accordingly, Bonamarte did not establish that Defendants breached the sales

16   agreement by failing to pay Bonamarte 150% of his prior 12-months' sales.

17    **B.    Bonamarte Received a Comparable Designation**

18    Bonamarte's breach of contract claim also fails because Defendants' provided Bonamarte

19   with a comparable designation.  The parties dispute what the term "comparable designation"

20   means.  Bonamarte claims that a comparable designation was nothing short of the exclusive right

21   to sell not only the Plus product line, but also the exclusive right to sell Smith & Nephew's entire

22   product line in his designated territory.  Defendants claim that allowing Bonamarte the exclusive

23   right to sell legacy Plus products in his territory constituted a comparable designation.  Based on

24

25

26   provision, the Court need not address this issue.

27    [8]This letter is also significant because it illustrates how Defendants could claim that the
change-in-control provision was not triggered, but still provide Bonamarte with a comparable
28   designation and re-designation.  Defendants simply offered the designations in the alternative while
disputing that the change-in-control necessary to trigger the provision had occurred.

1  the evidence presented at trial, "comparable designation" has no commonly accepted meaning and

2  is not generally used in the medical implant industry.

3      At the outset, the Court finds that the term "comparable designation" is ambiguous because

4  "it is capable of more than one reasonable interpretation." *Miller v. United States*, 363 F.3d 999,

5  1004 (9th Cir. 2004) (quoting *Badie v. Bank of America*, 67 Cal. App. 4th 779, 798 (1st Dist.

6  1998)).  When a contract term is ambiguous, the Court must construe "the ambiguous language by

7  applying the standard rules of interpretation in order to give effect to the mutual intention of the

8  parties." *Id.* (quoting *Badie*, 67 Cal. App. 4th at 798).  The Court must interpret the contract to

9  give effect to the mutual intention of the parties at the time of contracting considering the

10  circumstances at the time.  CAL. CIV. CODE §§ 1636, 1647.  The parties conduct after execution

11  "and before any controversy has arisen as to its effect affords the most reliable evidence of the

12  parties' intentions." *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (4th Dist.

13  1987).  When an uncertainty remains, "the language of a contract should be interpreted most

14  strongly against the party who caused the uncertainty to exist."  CAL. CIV. CODE § 1654; *Miller*,

15  363 F.3d at 1006 ("[W]here a contract is ambiguous, the language of a contract should be

16  interpreted most strongly against the party who caused the uncertainty to exist," *i.e.*, the drafter).

17      Bonamarte attempts to impute Mr. Distin's interpretation of "comparable designation" to

18  Defendants to establish Plus' intention at the time of contracting.  But, there are two problems with

19  this position.  First, Mr. Distin did not and could not testify that Plus intended for comparable

20  designation to mean the exclusive right to sell all Plus products and the exclusive right to sell all

21  the acquiring companies' products in the designated territory.  While Mr. Distin did suggest that he

22  understood this term to mean access to sell the acquiring companies' entire product line, this

23  conclusion was based almost entirely on his belief that the terminology was common in the

24  industry, a conclusion flatly rejected by the only industry expert to testify.  Additionally, Mr. Distin

25  acknowledges that he did not negotiate the agreement, but rather, Mr. Lorenzi, the signatory to the

26  contract, negotiated its terms.  Mr. Distin's testimony is of little help in determining the intention

27  of the parties, but to the extent that is does provide any insight, it supports Bonamarte's

28  interpretation.

1    The parties' conduct after execution and before any controversy arose favors Defendants'

2    interpretation.  However, the time frame involved limits its value.  While the sales contract was in

3    place for many years, no conduct could be expected based on the change-in-control provision until

4    Smith & Nephew acquired Plus.  But, in the ten weeks after the acquisition, both parties conducted

5    themselves as they had before.  Bonamarte continued to sell legacy Plus products, consistent with

6    Defendants' later designation and Defendants' interpretation of "comparable designation."  This

7    conduct, while only over the course of ten weeks, supports Defendants interpretation of

8    "comparable designation" because the parties' conduct was consistent with the term meaning that

9    Bonamarte could continue selling legacy Plus products under the existing terms of the contract.

10   Because the meaning of the term "comparable designation" cannot otherwise be resolved

11   based on the language of the contract, intentions of the parties, or industry custom and practice, the

12   Court must look to who drafted the provision.  CAL. CIV. CODE § 1654; *Miller*, 363 F.3d at 1006.

13   While there was testimony that Mr. Lorenzi negotiated the 150% down from 200%, the rest of the

14   testimony at trial indicates that Bonamarte demanded inclusion of this provision and drafted it.  As

15   the party that drafted the provision, Bonamarte caused the uncertainty to exist and the term

16   "comparable designation" must be construed against Bonamarte.  Bonamarte could easily have

17   drafted the provision to clearly state what he claims he intended — that he would be able to sell the

18   acquiring company's entire product line.  Instead, Bonamarte chose an ambiguous term not

19   commonly used in this industry that can fairly be interpreted to mean that he would continue to sell

20   the same products in the same territory as before the acquisition.  Construing the term against

21   Bonamarte, the Court finds that Defendants provided Bonamarte with a comparable designation by

22   honoring the terms of the existing sales agreement and allowing the continued sale of legacy Plus

23   products following the acquisition.  Accordingly, Bonamarte's breach of contract claim also fails

24   because Defendants provided a comparable designation.

25   **C.    Liquidated Damages**

26   Even if the Court found that Bonamarte complied with his obligations under the change-in-

27   control provision and that Defendants' designation and re-designations of him did not constitute

28

- 10 -

08cv1595

1    comparable designations, Bonamarte would still not be entitled to payment of 150% of his prior

2    12-months' sales because the payment would be an unenforceable penalty.

3        In reaching this conclusion, the Court must address two issues.  First, the Court must

4    determine whether the 150% payment is a liquidated damages provision subject to the limitations

5    discussed below or an alternative means of performance that escapes the limitations imposed on a

6    liquidated damages provision.[9]  *See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731,

7    738 (1973) (noting the distinction between a contract allowing performance in the alternative and

8    one requiring a single performance with an additional charge contingent on the breach of that

9    performance).  Second, because the Court finds it is a liquidated damages provision, the Court

10   must determine whether it is a valid liquidated damages provision or an invalid penalty.  The Court

11   finds it is an invalid penalty because it lacks "proportional relation to the damages which may

12   actually flow from failure to perform under a contract."  *Garrett v. Coast & S. Fed. Sav. & Loan*

13   *Ass'n*, 9 Cal. 3d 731, 739 (1973).

14       The 150% payment is a liquidated damages provision rather than an alternative means of

15   performance.  Bonamarte argues that the 150% payment was not triggered by a breach, *i.e.*

16   Defendants' failure to comparably designate him, but rather, the payment was triggered by the

17   acquisition of Plus by Smith & Nephew.  This is itself perplexing because at least five other things

18   had to happen following an acquisition before the 150% payment was triggered.  Bonamarte

19   characterizes the change-in-control provision as a choice between providing a comparable

20   designation and paying 150% of Bonamarte's prior 12-months' sales, similar to a termination

21   provision.

22       While the Court acknowledges that the provision could be framed as a choice between

23   providing a comparable designation and paying 150% of the prior 12-months' sales, "the only

24   purpose and effect of the formal alternative, [150% payment], is to hold over [the Defendants] the

25   larger liability as a threat" to compel a comparable designation.  *Blank v. Borden*, 11 Cal. 3d 963,

26

27

28       [9]During trial, Bonamarte initially argued that the 150% payment was a liquidated damages
     payment, arguing that Bonamarte's tax returns were irrelevant because the dollar amount owed should
     not be offset by his sales.  Bonamarte later changed position and argued that the provision was not a
     liquidated damages provision.

1  971 (1974) (discussing a liquidated damages provision that was ultimately deemed an illegal

2  penalty).  "[W]hen it is manifest that a contract expressed to be performed in the alternative is in

3  fact a contract contemplating but a single, definite performance with an additional charge

4  contingent on the breach of that performance, the provision cannot escape examination in light of

5  pertinent rules relative to the liquidation of damages."  *Garrett*, 9 Cal. 3d at 738.  The change-in-

6  control provision required Defendants to provide Bonamarte with a comparable designation.  If

7  Defendants ultimately failed to provide that designation, *i.e.* breached that obligation under the

8  contract, Defendants were required to pay 150% of his prior 12-month's sales.  Bonamarte cannot

9  avoid the scrutiny applicable to a liquidated damages provision by characterizing the provision as

10  something it was not.  *Garrett*, 9 Cal. 3d at 737 ("The mere fact that an agreement may be

11  construed, if in fact it can be, to vest in one party an option to perform in a manner which, if it

12  were not so construed, would result in a penalty does not validate the agreement.").

13       Because the Court finds that the 150% payment is a liquidated damages provision, the

14  Court must determine whether it a valid liquidated damages provision or an invalid penalty.  In

15  determining whether a provision is a proper liquidated damages clause or an invalid penalty, the

16  Court must look to the substance of the provision, rather than the form.  *Garrett*, 9 Cal. 3d at 737.

17  "The characteristic feature of a penalty is its lack of proportional relation to the damages which

18  may actually flow from failure to perform under a contract."  *Garrett*, 9 Cal. 3d at 739.  "A penalty

19  provision operates to compel performance of an act and usually becomes effective only in the event

20  of default upon which a forfeiture is compelled without regard to the actual damages sustained by

21  the party aggrieved by the breach."  *Garrett*, 9 Cal. 3d at 739 (internal citations omitted).

22       In *Garrett*, in determining whether late charges constituted a penalty or valid liquidated

23  damages, the Court considered the purpose of the charges.  *Garrett*, 9 Cal. 3d at 739-40.  The

24  Court found that if the sum at issue "exceed[ed] substantially the damages suffered by the lender,

25  the provision for the additional sum, whatever its label, [was] an invalid attempt to impose a

26  penalty inasmuch as its primary purpose [was] to compel prompt payment through the imposition

27  of charges bearing little or no relationship to the amount of the actual loss incurred."  *Garrett*, 9

28  Cal. 3d at 740.

1    The payment required by the change-in-control payment, 150% of Bonamarte's prior 12-

2  months' sales, bears no relationship to the damages which might actually flow from Defendants'

3  failure to comparably designate Bonamarte.  The 150% payment constitutes approximately four

4  and one half times annual commissions[10] — $1.9 million if the Court accepted Bonamarte's

5  assertion that the prior 12-months' sales should be calculated from the acquisition date.  This

6  constitutes an enormous windfall.  Bonamarte accurately notes that the Court must evaluate the

7  provision at the time the contract was formed rather than at the point of breach, but even looking

8  just at the terms, without plugging in the numbers that were ultimately at issue, it is a windfall that

9  bears no reasonable relationship to the damages Bonamarte would suffer if he did not receive a

10  comparable designation.  CAL. CIV. CODE § 1671 (liquidated damages provision is invalid if it was

11  "unreasonable under the circumstances existing at the time the contract was made.").  Based on the

12  terms of the provision, Bonamarte would earn four and one half times more than he had in the past

13  year without working or while also earning commissions from the sales of other products to his

14  Plus clients because the sales agreement did not contain a non-compete clause.

15    Even if the Court found that Bonamarte complied with the requirements of the change-in-

16  control provision and that he was not provided a comparable designation, he would still not be

17  entitled to the 150% payment because it constituted and invalid penalty.

18    **D.    Sales Commission Statutes**

19    Bonamarte's claims for violation of the Wisconsin and Illinois sales commission statutes

20  are based on an entitlement to the 150% payment.  Because the Court has found Bonamarate was

21  not entitled to the 150% payment, these claims also fail.

22  **III.    Nichols Findings of Fact and Conclusions of Law**

23    Nichols entered into a sales agreement with Plus that was effective on January 1, 2006.

24  Nichols asserts three claims: breach of contract; breach of the covenant of good faith and fair

25  dealing; and violation of Colorado's sales commission statute.

26  ///

27  ///

28

---

[10]Bonamarte earned 33% in commissions.

### A.      Breach of Contract

"The standard elements of a claim for breach of contract are: (1) contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to the plaintiff therefrom." *Wall Street Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2d Dist. 2008).  Only the third and fourth elements, defendant's breach and damage to the plaintiff from the breach, are at issue in this case.

### 3.      Breach

Nichols claims that Defendants breached the express provisions of the sales agreement by: (1) failing to provide technical assistance as required by Section 2.1 of the sales agreement; (2) offering members of Nichols' sales force positions with Smith & Nephew in violation of Section 16.5; (4) failing to provide invoices and detailed commission statements required by the sales agreement; (3) failing to negotiate quota; and (4) failing to pay commissions in a timely fashion.

### a.      Technical Assistance

Section 2.1 of the sales agreement provides that "to assist Sales Agent with respect to the obligations under this Section 2.1, and for the mutual benefit of Sales Agent and Plus, Plus will extend its technical expertise to Sales Agent and its employees and representatives."  The preceding portion of Section 2.1 generally provides that Nichols will use his best efforts to promote Plus products, maintain the requisite level of expertise necessary to sell the products, and complete appropriate training on the products.  Nichols argues a violation of this provision evidenced by the absence of training on products, the lack of technical support for the Galileo system used for implantation, and the lack of new development of Plus products.  But, Section 1.5 states that Defendants "reserve the right to discontinue developing . . . or distributing any of the Products, to modify, replace, or add to any of the Products it produces and sells, and to modify in any way the Products to be sold by Agent in its sole discretion and at any time."  Under the terms of the sales agreement, Defendants could stop developing and distributing new products in their sole discretion at any time.

///

///

1    "Any contract must be construed as a whole, with the various individual provisions

2    interpreted together so as to give effect to all, if reasonably possible or practicable."  *City of*

3    *Atascadero v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (6th Dist.

4    1998) (citing CAL. CIV. CODE § 1641).  "Courts must interpret contractual language in a manner

5    which gives force and effect to every provision, and not in a way which renders some clauses

6    nugatory, inoperative or meaningless."  *Id.* at 473.  Based on the entirety of Section 2.1 and the

7    sales agreement, the Court agrees that Defendants were obligated to provide technical assistance,

8    including training on products and technical support for the use of Galileo, to Nichols, but

9    Defendants were not obligated to continue development and distribution of new products.  Reading

10   the sales agreement as a whole, the Court cannot find that Defendants breached the sales agreement

11   by discontinuing development of Plus products when the sales agreement specifically authorized

12   just that.

13          However, the Court does find that Defendants breached Section 2.1's requirement for

14   technical support by failing to provide any training to Nichols on products and failing to provide

15   technical support for use of the Galileo system.  Undisputed testimony established that Defendants

16   conducted no meetings and provided no training to Nichols.  Sean Cogan testified that one training

17   program might have been available to Nichols — the Focus on Excellence Courses — because they

18   are open to all sales representatives.  But, he also acknowledged that Nichols was not on an

19   invitation list for the training and might not have been invited at all if the higher level in the

20   management structure did not forward it along.  Additionally, there was undisputed testimony that

21   the Galileo system often quit working during surgeries because Defendants were not providing

22   technical support for the system and that the system was not receiving the technical updates and

23   patches necessary.

24                              **b.     Non-Solicitation**

25          Nichols also claims that Defendants violated Section 16.7 of the sales agreement by

26   offering positions with Smith & Nephew to members of Nichols' sales force.  Section 16.7

27   provides that "Sales Agent and Plus agree not to employ or otherwise engage the services of any

28   employee, agent, or representative of the other during the term of this Agreement and for the one

1   (1) year period following its termination or expiration, including without limitation any employee,

2   agent, or representative of the other party who ceased working with such other party during the one

3   (1) year period prior to the termination or expiration of this Agreement."

4   　　　The provision prohibits Defendants from "employ[ing] or otherwise engaging the services"

5   of Nichols' sales force.  Defendants did not breach this obligations because Defendants did not

6   actually employ or hire any of Nichols' sales force, although they did solicit them for positions

7   with Smith & Nephew.  The heading for the provision, "Non-Solicitation," might suggest it

8   includes soliciting, but Section 16.12 states, "Section and Subsection headings used herein are for

9   convenience or reference only, are not part of this Agreement and are not to affect the construction

10  of, or be taken into consideration in interpreting any provision of this Agreement."  Defendants did

11  not breach the sales agreement by offering positions to Nichols' sales force when those members of

12  the sales force were never employed or engaged for any services.  Even if Defendants had breached

13  the agreement by employing or engaging the services of a member of Nichols' sales force, Nichols

14  has not proven any damages flowed from this breach.

15  　　　　　　　**c.   Invoices and Commission Statements**

16  　　　Nichols also claims that Defendants failed to provide invoices and commission statements

17  in breach of Sections 8.4 and 8.5 of the sales agreement.  Section 8.4 provides that "[c]opies of all

18  invoices sent to customers in the Territory for each month during the Term will be forwarded to the

19  Sales Agent monthly."  Section 8.5 provides that

20  　　　　[a] statement detailing commissionable activity in the Territory will be sent to the
    　　　　Sales Agent each month when payment of commission is made.  The statement
21  　　　　shall include an accounting of the orders for which payment is made, including the
    　　　　customer's name and invoice number; the rate of commission on each order; and
22  　　　　information relating to any charge backs included in the accounting.

23  　　　Nichols put forth undisputed evidence that Nichols did not receive copies of invoices sent

24  to customers and that the commission statements received provided only an aggregate dollar

25  amount of sales rather than the detailed information required by Section 8.5, *i.e.*, customer's name,

26  invoice number, and rate of commission on each order.  Defendants breached the sales agreement

27  by failing to comply with Sections 8.4 and 8.5.

28  ///

1          **d.      Negotiating Quota**

2          Section 1.1 specifically provides that "[q]uotas will be negotiated by Plus and Sales Agent

3   and updated on an annual basis."  Defendants admitted at trial that Defendants did not negotiate

4   Nichols' quota.  Accordingly, the Court finds that Defendants breached the sales agreement by

5   failing to negotiate quota in breach of Section 1.1.

6          **e.      Untimely Commission Payment**

7          Section 8.3 requires "[p]ayment of Agent's commissions will be made on the last day of the

8   month following the month in which the valid purchase order for a particular Product was

9   received."  Nichols presented evidence that Defendants delayed commission payments totaling

10  $17,332 following the expiration of Nichols' sales agreement and Defendants admit that payment

11  was delayed months.  Because this provision specifically requires payment at a particular time and

12  Defendants did not make payment as agreed, Defendants breached Section 8.3.

13         **4.      Damages**

14         Despite Defendants' express breaches of the sales agreement, Nichols cannot prevail

15  because Nichols has not proven any damages flowed from the breaches establish.  Additionally,

16  even if he did establish he suffered damages from the breaches proven, Defendants have

17  established that he mitigated those damages.

18         To succeed on his claim for breach of contract, Nichols must prove he suffered damages as

19  a result of the breaches of the contract.  *St. Paul Fire & Marine Ins. Co. v. American Dynasty*

20  *Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060 (2d Dist. 2002) ("An essential element of a

21  claim for breach of contract are damages resulting from the breach.  Causation of damages in

22  contract cases requires that the damages be proximately caused by the defendants' breach.").

23  Nichols has failed to prove damages in two respects.  First, Nichols has failed to prove that the

24  $372,401 in claimed lost profits resulted from the breaches actually established.  Second, even if

25  the Court accepts that the entire $372,401 resulted only from the breaches found by the Court,

26  Nichols mitigated those damages.

27         As previously discussed, Nichols has established some breaches of the sales agreement.

28  However, the Court has also found that many of the breaches asserted were not breaches.  Nichols

1   claimed that all of the asserted breaches and violations collectively caused the decline in sales

2   Nichols experienced following the acquisition.  That overall decline in sales is the basis for

3   Nichols' damages calculation.

4          Now that the Court has determined that some of the conduct that caused a decline in

5   Nichols' sales did not breach the sales agreement, the Court has no basis for determining how

6   much of the decline in sales is attributable to breaches proven.  In other words, Nichols has failed

7   to prove that Nichols' $372,401 in lost profits flowed from Defendants failing to provide access to

8   necessary instrumentation, failing to provide training, denying access to marketing meetings,

9   failing to provide technical assistance necessary for Galileo, failing to provide invoices and

10  commission statement, failing to negotiate quota, and failing to timely pay commissions.  While

11  the Court can safely say that the damages would be much less than $372,401, given that many of

12  the breaches upon which the sales decline was based were not actually breaches, the damages from

13  the established breaches have not been proven with sufficient certainty.

14         Furthermore, Nichols has failed to establish that all the damages sought were proximately

15  caused by the specific breaches actually proven.  "Under contract principles, the non-breaching

16  party is entitled to recover only those damages, including lost profits, which are 'proximately

17  caused' by the specific breach."  *St. Paul Fire & Marine Ins. Co.*, 101 Cal. App. 4th at 1061

18  (internal quotation marks omitted).  Additionally, damages must be proven with reasonable

19  certainty.  CAL. CIV. CODE § 3301 ("Damages must be certain.  No damages can be recovered for a

20  breach of contract which are not clearly ascertainable in both their nature and origin.").

21         Finally, even if the Court assumed that Nichols suffered $372,401 in lost profits from the

22  breaches proven and $39,000 in a lost retention bonus, those damages have been mitigated.  "A

23  plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take

24  reasonable steps to mitigate those damages and will not be able to recover for any losses which

25  could have been thus avoided."  *Shaffer v. Debbas*, 17 Cal. App. 4th 33, 41 (4th Dist. 1993).

26  During the term of the sales agreement with Defendants, Nichols shifted his work from Defendants

27  to DePuy and, assuming he suffered $372,401 in lost profits and $39,000 in a lost retention bonus,

28  mitigated that entire amount in earnings from DePuy.  Nichols earned $396,000 in salary and a

1   $100,000 in a bonus from DePuy during the remaining term of the sales agreement with

2   Defendants.

3          Nichols points out that he was free to work for DePuy in addition to his work for

4   Defendants by the terms of the sales agreement and that this precludes the Depuy earnings from

5   constituting mitigation.  The Court agrees that Nichols was free to work for DePuy in addition to

6   working for Defendants.  But, Nichols did not continue working at the same pace for Defendants

7   and add the DePuy work.  Nichols' time allocation went from approximately 60 hours a week for

8   Defendants to approximately 30 hours a week for Defendants and 30 hours a week for DePuy when

9   Nichols picked up the DePuy work.[11]  Accordingly, even if the Court assumed that Nichols had

10  proven his damages with the requisite certainty, Nichols mitigated those damages in earnings from

11  DePuy.

12          **B.      Breach of the Covenant of Good Faith and Fair Dealing**

13          Nichols claims that Defendants breached the covenant of good faith and fair dealing by

14  engaging in a variety of conduct detrimental to Nichols' sales.  The Court finds that Defendants:

15  (1) conducted a second recall after indicating that the first covered all impacted implants; (2)  re-

16  branded and re-numbered legacy Plus products with the Smith & Nephew brand and Smith &

17  Nephew numbering; (3) stopped development of legacy Plus products; (4) provided Nichols with

18  less sales support and sales information than prior to the acquisition and did not allow Nichols

19  access to the handheld IPAQ ordering system; (5) provided less access to instrumentation than

20  before the acquisition; (6) failed to provide product training or include Nichols in marketing

21  meetings involving legacy Plus products.  While all these events occurred, only some of them

22  violate the covenant of good faith and fair dealing when considered in context and taking into

23  account the terms of the sales agreement.  Additionally, as discussed above, Nichols cannot

24  succeed on this claim because he has failed to prove that the damages he suffered flowed from

25  actual violations of the covenant of good faith and fair dealing.

26

27

28          [11]The Court notes that its conclusion is based in part on the significant testimony about the
    nature of the work.  Nichols was required to allocate significant time to serving these surgeons,
    including being on site for surgeries and easily accessible.

"In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979).  Under the covenant, parties are prohibited from doing anything to interfere with performance of the contract and obligated "to do everything that the contract presupposes that he will do to accomplish its purpose." *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (2d Dist. 2004).  The covenant prevents a party from "unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original).

The covenant "cannot impose substantive duties or limitations on the contracting parties beyond those incorporated in the specific terms of their agreement," *Guz,* 24 Cal. 4th at 350, but "breach of a specific provision of the contract is not a necessary prerequisite" for a violation of the covenant because the covenant would then serve no purpose.  *Carma Developers v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).  The covenant is "a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."  *Love*, 221 Cal. App. 3d at 1153 (emphasis in original).  "The precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." *Egan*, 24 Cal. 3d at 818; *see also Foothill Props. v. Lyon/Copley Corona Assocs.*, 46 Cal. App. 4th 1542, 1551 (4th Dist. 1996).

### 1.    Recall

Defendants did not violate the covenant of good faith and fair dealing in handling the recall of legacy Plus products.  Defendants' recall of certain implants was not perfect, in hindsight, but the delay in notification of Nichols was minimal, just a few days from the determination that a recall in the United States was warranted and notification of Nichols.  Additionally, assurances that all impacted products were encompassed in the first recall were based on the best information available at the time.  While Defendants' assurances that the first recall identified all the impacted implants — those with iron levels that were too high — when additional implants were later

subject to recall, there was no evidence that Defendants knew or should have known anything more than they disclosed to Nichols.  Generally, the recall was handled properly.

### 2.      Re-Branding and Re-Numbering

Defendants did not violate the covenant of good faith and fair dealing by re-branding and re-numbering legacy Plus products or in providing sales support and access to sales information.[12] While the covenant of good faith and fair dealing is a supplement to the express contractual terms, the covenant cannot stray this far from the contractual terms and purpose.  *Guz,* 24 Cal. 4th at 350. Here, Nichols would have Defendants maintain two separate product lines, inventory systems, and sales support staff, presumably until all contracts with Plus sales representatives expired.  Such an approach does not tie back to any of the terms of the sales agreement.  Additionally, the marketing and administrative challenges Nichols faced as a result of the re-branding and re-numbering were not substantial enough that the Court could find that Defendants frustrated Nichols' rights under the sales agreement.  *Love,* 221 Cal. App. 3d at 1153.  The administrative challenges in access to necessary information for sales were short-lived and worked out within a few months after the acquisition.

### 3.      Product Development & Ordering

Defendants did not violate the covenant of good faith and fair dealing in ceasing development of legacy Plus products or in not providing Nichols access to the handheld IPAQ ordering system because the sales agreement allowed Defendants to do both.  The covenant of good faith and fair dealing cannot prohibit conduct that is expressly permitted under a contact. *Carma Developers*, 2 Cal. 4th at 374; *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061 (4th Dist. 2010) ("The implied covenant cannot contradict the express terms of the contract.").  Section 1.5 of the sales agreement states that Defendants "reserve the right to discontinue developing . . . or distributing any of the Products, to modify, replace, or add to any of the Products it produces and sells, and to modify in any way the Products to be sold by

---

[12]The Court notes that Nichols' claim under the covenant of good faith and fair dealing is based on a lack of continual access to sales reporting information that was available, without resort to a district manager prior to the acquisition rather than denial of sales invoices, addressed above as a breach of contract.

Agent in its sole discretion and at any time."  Under the terms of the sales agreement, Defendants could stop developing and distributing new products in their sole discretion at any time. Additionally, Section 9.5 provides that Defendants "shall not be liable to Sales Agent for any loss or damage caused by non-acceptance of orders by Plus, by any failure of Plus to deliver products, or by delays in making shipments regardless of cause."  Because Defendants cannot be liable for not accepting or delivering orders or delaying shipments under the express terms of the contract, Defendants cannot be liable for ordering and delivery delays resulting from lack of access to a particular method of ordering.

### 4.    Instrumentation / Training / Meetings

Defendants did violate the covenant of good faith and fair dealing by failing to provide Nichols access to necessary instrumentation, failing to provide any training, and denying access to marketing meetings involving legacy Plus product.

Nichols established that access to instruments for implantation was critical for sales because sales representatives are responsible for providing instruments for the surgery to implant the products and must obtain the instruments from Defendants.  Instruments necessary for the Galileo system were often not available.  The ability to use this system was a key part of Nichols' sales.  Additionally, Nichols sought specific instrumentation for one of his most important surgeons and followed up with calls on its status, but was unable to obtain the instrument for his surgeon.  Then, a Smith & Nephew representative, a Nichols competitor, attended a meeting to which Nichols was not invited and thereupon provided the instrument directly to the surgeon, undermining Nichols' relationship with the surgeon.

Compliance and product training and participation in marketing meetings was also critical for successful sales because it apprised sales representatives of the benefits and features of the products and provided guidance to sales representatives on acceptable levels of conduct between sales representatives and the medical community.  These trainings and marketing meetings were particularly important when attended by Nichols' surgeons.  But, Defendants did not invite Nichols to any marketing meetings or trainings, including those that his surgeons and competitors were attending.  Additionally, Defendants offered no training to Nichols.

08cv1595

1     While Nichols has established these limited violations, as discussed above, Nichols has not

2     established that the damages he suffered flowed from the violations rather than other alleged

3     violations not proven.

4        **C.**     **Colorado Commission Protection Act**

5     The Colorado Wholesale Representatives Law ("State Law") provides that "[a] distributor,

6     jobber, or manufacturer who *knowingly* fails to pay commissions as provided in any written

7     contract or written sales agreement shall be liable to the wholesale sales representative in a civil

8     action for treble the damages proved at trial." COLO. REV. STAT. § 12-66-103 (emphasis added).

9     Defendants argue that they are not liable because the $17,332 commission owed was ultimately

10     paid several months late and that Nichols did not establish that Defendants "knowingly" failed to

11     pay the commission.

12     "[F]ederal courts exercising diversity jurisdiction must apply as their rules of decision the

13     substantive law of the states.  Generally, state law is determined by statutes or by pronouncements

14     from the state's highest court.*" Jerry Beeman & Pharmacy Servs., Inc. v. Antem Prescription*

15     *Mgmt.*, LLC, 652 F.3d 1085, 1092 (9th Cir. 2011).  Here, Colorado's Supreme Court has not

16     addressed the meaning of "knowingly" in this statute.  When a state supreme court has not

17     addressed an issue, "a federal court must predict how the highest state court would decide the issue

18     using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises,

19     and restatements as guidance.  However, where there is no convincing evidence that the state

20     supreme court would decide differently, a federal court is obligated to follow the decisions of the

21     state's intermediate appellate courts." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958,

22     961 (9th Cir. 2001).  None of Colorado's intermediate courts have addressed this issue and a

23     review of similar statutes in other jurisdictions and treatises do not provide any guidance.

24     While the Colorado Supreme Court has not addressed the meaning of "knowingly" in this

25     particular statute, the Court discussed the term generally in *Rinnander v. Denver Milk Producers,*

26     114 Colo. 506 (1946).  The Court essentially found someone could act knowingly by simply

27     having knowledge of relevant facts, even if those facts were contradicted by other information.

28     Additionally, the plain language of the statute requires that Defendants knew that they had not paid

the commission as required by the sales agreement.  Here, there is no dispute that Defendants knew the commissions were due and failed to pay them.  The evidence presented establishes that Defendants knew commissions were owed to Nichols and the commissions were not paid for months.  Correspondence to Nichols from Defendants acknowledged the commissions were due months before they were paid.  The Court finds that Defendants knowingly failed to pay Nichols $17,332 in commissions as required by the sales agreement and Nichols is entitled to treble damages.

**CONCLUSION**

The Clerk shall enter Judgment in favor of Defendants on Plaintiffs' claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, violation of the Wisconsin Sales Representative Law, and violation of the Illinois Sales Representative Act.  The Clerk shall enter Judgment in favor of Nichols on Nichols' claim for violation of the Colorado Wholesale Sales Representative Law for $34,664.

The Clerk shall close the case.  The Court retains jurisdiction to consider any post-judgment motions.

**IT IS SO ORDERED.**

DATED:  October 25, 2011

Hon. Roger T. Benitez
United States District Judge